464 So.2d 475 (1985)
Richard Gerald JORDAN
v.
STATE of Mississippi.
No. 55493.
Supreme Court of Mississippi.
January 30, 1985.
Rehearing Denied March 13, 1985.
*477 Joseph P. Hudson, Lawyer & Hudson, Earl B. Stegall, Gulfport, Timothy N. Black, Philip D. Anker, Saone B. Crocker, Washington, D.C., for appellant.
Edwin Lloyd Pittman, Atty. Gen. by William S. Boyd, III, and Marvin L. White, Jr., Sp. Asst. Attys. Gen., Jackson, Albert Necaise, Dist. Atty. by Joe Sam Owen, Sp. Prosecutor, Gulfport, for appellee.
EN BANC.
ROY NOBLE LEE, Presiding Justice, for the Court:
This case involves the third time that Richard Gerald Jordan has been sentenced to death for the capital murder of Mrs. Edwina Marter. On July 21, 1976, he was found guilty of capital murder and was given the death penalty for the first time. That conviction was prior to procedures laid down in Jackson v. State, 337 So.2d 1242 (Miss. 1976), providing for bifurcated trials in capital murder cases. The lower court granted a motion for new trial under the precedents established in Jackson and Jordan was tried, convicted and sentenced to death a second time. The conviction and sentence were affirmed in Jordan v. State, 365 So.2d 1198 (Miss. 1978), petition for rehearing was denied by this Court, and Jordan petitioned the United States Supreme Court for writ of certiorari to the Mississippi Supreme Court, and certiorari was denied. Jordan v. Mississippi, 444 U.S. 885, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979).
Subsequently, Jordan applied to this Court for leave to file a petition for writ of error coram nobis, which was denied. 390 So.2d 584. The Federal District Court denied habeas corpus relief, and, upon appeal of such denial, the United States Fifth Circuit Court of Appeals, 688 F.2d 395, vacated the sentence and remanded for another sentencing hearing finding that there had been a violation of the Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) mandate, in that the instructions failed to channel the sentencers' discretion by clear and objective standards, and did not provide specific and detailed guidance. 681 F.2d 1067. The State of Mississippi was denied rehearing in Jordan v. Thigpen, 688 F.2d 395 (5th Cir.1982).
Jordan was tried again on the sentencing phase in the Circuit Court of Harrison County, and, for the third time, a jury imposed the death penalty upon him. He has appealed from that sentence and assigns eleven (11) errors in the trial below. The facts of the case are detailed in Jordan v. State, 365 So.2d 1198 (Miss. 1978), and we will only briefly state them here.
On or about January 10, 1976, Jordan traded a shotgun for a.38-caliber revolver in Baton Rouge, Louisiana, then drove to Gulfport, Mississippi, and registered at the Twin Star Motel under the name of "Jack Wilson." In order to obtain money, he devised a scheme to kidnap the relative of a bank executive and demand a ransom. Still using the fictitious name of "Jack Wilson," he called Gulf National Bank and expressed a desire to speak to the commercial loan officer, and was referred to a Mr. Marter, whose wife subsequently became Jordan's victim.
*478 Jordan perused the Gulfport telephone directory and found that there was only one family by the name of Marter living in the city. He drove by the Marter residence, then stopped, rang the doorbell and was admitted into the home by Mrs. Marter, when he represented that his electrical company had received information of defective circuit breakers in the area, which he was investigating.[1] Thereupon, he kidnapped Mrs. Marter and took her to a sparsely settled wooded area in DeSoto National Park where he shot her in the head with the .38-caliber revolver and killed her. Jordan then demanded $25,000 from Mr. Marter without telling him that his wife had been slain. Mr. Marter obtained the ransom money, delivered it to a drop place as instructed by Jordan, who retrieved the ransom. He was followed by the police and was arrested within a relatively short while.

I.

THE TRIAL COURT'S INSTRUCTIONS ON AGGRAVATING CIRCUMSTANCES WERE UNCONSTITUTIONALLY VAGUE AND PERMITTED THE JURY TO FIND AGGRAVATING CIRCUMSTANCES THAT WERE UNSUPPORTED BY THE RECORD AND THAT IMPERMISSIVELY OVERLAPPED WITH EACH OTHER AS WELL AS THE STATUTORY ELEMENTS OF CAPITAL MURDER.
Under this assignment of error, Jordan attacks three elements of aggravating circumstances submitted to the jury, viz, (1) especially heinous, atrocious and cruel, (2) for pecuniary gain, and (3) while engaged in the commission of the crime of kidnapping.

A. Especially heinous, atrocious and cruel.

The record indicates that Jordan entered the home of Mrs. Marter when only she and her small child, who was asleep, were in the home. He forced her to leave her home, refused to permit her to arrange for the care of the child or take the child with her, then forced her to an isolated place. The record reflects that she was frightened during this time and inferences are that he shot her in the back of the head at a time when she was on her knees. Regardless of her position at the time of the murder, if she was running or trying to get away from him, that indicates how terrified she was at the time he killed her. We think these facts constituted a question for the jury as to whether the killing was especially heinous, atrocious and cruel, and as said by the Fifth Circuit in Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978),
Again, we feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies  the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
578 F.2d at 611.
We have decided this question adversely to Jordan's position in Edwards v. State, 441 So.2d 84 (Miss. 1983), and in every case where the question has been raised since Edwards.

B. For Pecuniary Gain.

Jordan contends that it was improper to allow the jury to consider both kidnapping and pecuniary gain because they are elements of the same offense, and there was a doubling of aggravating circumstances. This question has been decided adversely to Jordan in Irving v. State, *479 441 So.2d 846 (Miss. 1983); Tokman v. State, 435 So.2d 664 (Miss. 1983); Hill v. State, 432 So.2d 427 (Miss. 1983); Gilliard v. State, 428 So.2d 576 (Miss. 1983); and Smith v. State, 419 So.2d 563 (Miss. 1982). In Henry v. Wainwright, 721 F.2d 990 (5th Cir.1983), the Fifth Circuit Court of Appeals rejected the same constitutional arguments, holding that resolution of the issue was a question of state law.

C. While Engaged in the Commission of the Crime of Kidnapping.

Argument on this issue parallels Jordan's argument on Section B, next preceding. We answer that question as hereinabove, viz, this Court has decided it adversely to Jordan in Billiot v. State, 454 So.2d 445 (Miss. 1984); Wilcher v. State, 448 So.2d 927 (Miss. 1984); and Leatherwood v. State, 435 So.2d 645 (Miss. 1983).

II.

THE DEFENDANT WAS SENTENCED TO DIE UNDER INSTRUCTIONS THAT UNCONSTITUTIONALLY SHIFTED THE BURDEN OF PROOF TO THE DEFENSE AND THAT FAILED TO INFORM THE JURY OF ITS DISCRETION TO EXERCISE MERCY.

III.

THE TRIAL COURT'S INSTRUCTIONS IMPROPERLY PERMITTED THE JURY TO SENTENCE DEFENDANT TO DEATH WITHOUT MAKING THE ESSENTIAL FINDING THAT HE INTENDED TO KILL, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS.
Under Assignment II above, Jordan argues that the sentencing instructions were improper because they did not require the State to prove that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, and that they did not advise the jury that it had the authority to exercise mercy and return a life sentence regardless of its findings. These arguments are not new and have been presented to this Court previously. In Gray v. Lucas, 677 F.2d 1086 (5th Cir.1982), the Court addressed the same proposition raised here and resolved the question against Jordan's position. See also Billiot v. State, 454 So.2d 445 (Miss. 1984); Wilcher v. State, 448 So.2d 927 (Miss. 1984); and Hill v. State, 432 So.2d 427 (Miss. 1983).
As to the second part of the present assignment, it is beyond peradventure that instructions must be read and considered as a whole in analyzing whether they should be granted or denied. We have carefully considered Instruction S-1 and are of the opinion that it clearly and adequately charged the jury in such manner that the jury's discretion was channeled and guided. On the other hand, we are of the opinion that the proffered instruction by appellant would have removed such channeling and probably would have authorized the return of a verdict outside the scope of evidence, which could result in an uneven and prejudicial capital punishment. Therefore, we are of the opinion that the jury was properly instructed under this question. See Irving v. State, 441 So.2d 846 (Miss. 1983); Hill v. State, 432 So.2d 427 (Miss. 1983); and Bullock v. State, 391 So.2d 601 (Miss. 1980).
Under Assignment III, Jordan argues that the trial court erred in permitting the jury to sentence defendant to death without first requiring them to find that he intended to kill in violation of the United States Supreme Court's decision in Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Those courts which have been faced with this question have universally found that the death penalty is permissible where one of the four following conditions exists: (1) where the defendant actually kills, (2) where the defendant attempts to kill, (3) where the defendant intends that a killing take place, or (4) where the defendant contemplated that lethal force would be employed. See Reddix v. Thigpen, 728 F.2d 705 (5th Cir.1984); Drake v. Francis, 727 F.2d 990 (11th Cir.1984); Skillern v. Estelle, 720 F.2d 839 *480 (5th Cir.1983); Henry v. Wainwright, 721 F.2d 990 (5th Cir.1983); Stephens v. Kemp, 721 F.2d 1300 (11th Cir.1983); Stanley v. Zant, 697 F.2d 955 (11th Cir.1983); Ross v. Hopper, 716 F.2d 1528 (11th Cir.1983); Clark v. Louisiana State Penitentiary, 697 F.2d 699 (5th Cir.1983); Bell v. Watkins, 692 F.2d 999 (5th Cir.1982); Irving v. State, 441 So.2d 846 (Miss. 1983); and Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
In the case at bar the jury found that Jordan killed, and also that Jordan contemplated lethal force be employed.
Therefore, we are of the opinion that there is no merit in this contention.

IV.

THE TRIAL COURT ERRONEOUSLY ADMITTED A TAPE RECORDED STATEMENT ELICITED FROM DEFENDANT IN THE ABSENCE OF APPOINTED COUNSEL.
Jordan requested an attorney prior to his preliminary hearing or arraignment, but after formal charges had been filed against him. The trial judge agreed that Jordan should have an attorney prior to his preliminary hearing, and sent him out with a bailiff. Shortly thereafter, Jordan was questioned by the police without counsel, the police not knowing that counsel had been appointed. Statements were made which were tape recorded and introduced into evidence at the trial over defense objections. Appellant argues that the statements should have been suppressed by the trial court at the resentencing hearing and at the Federal habeas corpus proceeding.
In Jordan v. State, 365 So.2d 1198 (Miss. 1978), the Court, citing Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), stated:
[T]he United States Supreme Court made it clear that an accused can voluntarily, knowingly and intelligently waive his right to counsel at an interrogation which occurs after counsel has been appointed, provided the prosecution has adequately carried its heavy burden to show that the waiver was knowingly and intelligently made.
365 So.2d at 1202.
The argument under this assignment was raised and the question was addressed in Jordan's petition for writ of habeas corpus. In passing on the question, the United States Court of Appeals in Jordan v. Watkins, 681 F.2d 1067, 1075 (5th Cir.1982) said:
Appellant also argues that his right to counsel under the sixth and fourteenth amendments was violated by his interrogation in the absence of counsel after adversary proceedings had commenced. It is undisputed that adversary proceedings had commenced when the authorities elicited the recorded confession. "[O]nce adversary proceedings have commenced against an individual, he has the right to legal representation when the government interrogates him." Brewer v. Williams, 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424, 438 (1977). This does not mean that at that stage an accused cannot waive his rights under the sixth and fourteenth amendments. Id., 430 U.S. at 405-406, 97 S.Ct. at 1243, 51 L.Ed. at 441. Rather, it is "encumbent upon the [prosecution] to prove an intentional relinquishment of a known right or privilege." Id., 430 U.S. at 404, 97 S.Ct. at 1242, 51 L.Ed. at 439. Based on the facts and circumstances previously discussed, we hold that the prosecution met this strict standard with respect to Jordan.
We are of the opinion that the State met its burden with respect to Jordan and that question is now res judicata.

V.

THE VOIR DIRE RESULTED IN A JURY SKEWED IN FAVOR OF SENTENCING THE DEFENDANT TO DEATH, IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.
Jordan contends that (1) four jurors removed for cause did not make it unmistakeably *481 clear that they would automatically vote against the death penalty without regard to the evidence and instruction of the court, (2) that the State followed a systematic practice of peremptorily excusing jurors who expressed qualified reservations against the death penalty, and (3) that the death qualification of the jury had the effect of creating a hanging jury.
Juror Jones, Juror Belvin, Juror Lyons and Juror Osswald, were all excused for cause. All of those veniremen, except Juror Jones, stated without equivocation that they were opposed under the circumstances to the imposition of the death penalty. Juror Jones equivocated in her responses, but ultimately stated, and, from the totality of her responses, it was reflected that she absolutely opposed the infliction of the death penalty.
The landmark case on this question is Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), where the United States Supreme Court held:
[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.
391 U.S. at 522, 88 S.Ct. at 1777, 20 L.Ed.2d at 784-85.
In Williams v. Maggio, 679 F.2d 381 (5th Cir.1982), the Court said:
By means of this appeal, petitioner asks this Court to narrow further the stiff requirements of Witherspoon and its progeny and, in this Court's opinion, thereby infringes the State's right to an impartial jury that is willing to consider all penalties provided by law. According to petitioner's analysis, exclusion of a venireman is impermissible unless he states in response to all questions that he absolutely refuses to consider the death penalty. An equivalent response framed in any other reasonable manner is judged to demonstrate that the individual's position is not firm. We reject such a rigid, unthinking interpretation of Witherspoon. Form will not be placed over substance.
679 F.2d at 386. See also Porter v. Estelle, 709 F.2d 944 (5th Cir.1983).
After carefully scrutinizing the voir dire examination of the jurors, we are of the opinion that the jury was lawfully and properly selected and impaneled, and we reject the contentions of the appellant on this assignment. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Willis v. Zant, 720 F.2d 1212 (11th Cir.1983); Washington v. Watkins, 655 F.2d 1346 (5th Cir.1981) reh. and reh. en banc den. 662 F.2d 1116 (1981); United States v. Carlton, 456 F.2d 207 (5th Cir.1972).

VI.

THE PROSECUTOR'S CLOSING ARGUMENT INCLUDED NUMEROUS REFERENCES TO THE DEFENDANT'S PRIOR EXERCISE OF HIS FIFTH AMENDMENT RIGHT NOT TO TESTIFY AS WELL AS OTHER HIGHLY IMPROPER AND PREJUDICIAL REMARKS.
The record from the two previous trials reflects that Jordan elected not to testify at either the guilt or sentencing phases. Upon the resentencing hearing in the present case, Jordan testified in his own behalf and attempted to convince the jury that he did not intentionally kill Mrs. Marter. In closing argument, the prosecutor made the following remarks relative to Jordan's testimony and the fact that this was the first time he had testified in explanation of the killing:
Through the entire procedure that we employed here, at another time and another place we presented this case, and the Jury found him guilty. We were required to do so as we went through that process of convicting him of guilt. Now the time comes for the sentencing, and we see Mr. Jordan come up on the stand. Six years. He takes the stand and he says, I'm a changed man; I didn't mean to do what I did. You finally got *482 me convicted; now you got me in the box; it's getting close to the penalty stage; I'm going to play on your sympathy, I'm going to play on your mercy, I'm going to play on your bias. I'm a changed man. I didn't mean to do what I did. It was an accident, and I'm sorry because I have found the Lord.
* * * * * *
... Another thing that is bothering me, and has bothered me since 1976  and I have never had to face this problem until Mr. Jordan took the stand... .
* * * * * *
... Many many years we have worked on this case waiting for this very minute, and I'll be dadgum it, if he doesn't take the witness stand and say "I'm sorry'; "I'm sorry that I did it, and I think I ought to have life imprisonment." See, because when I was a little boy I wasn't a bad fellow.
Jordan contends that the closing arguments of the prosecuting attorney were improper and prejudicial because they related to the exercise of his Fifth Amendment right not to testify in the previous trials. He relies in principal on Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) reh. den. 381 U.S. 957, 85 S.Ct. 1797, 14 L.Ed.2d 730. There, Griffin chose not to testify during the guilt phase of his bifurcated trial, but did testify at the sentencing hearing. The trial judge instructed the jury that it was permissible to draw unfavorable inferences from the defendant's failure to testify. The prosecutor's comment and the judge's instruction were on the issue of guilt that occurred before the jury reached its verdict. We distinguish that case from the case sub judice. In Calloway v. Wainwright, 409 F.2d 59 (5th Cir.1968), the Court said:
It is clear that when a defendant voluntarily testifies to the merits, and not just upon a purely collateral matter, the prosecutor may comment upon the defendant's failure to deny or explain incriminating facts already in evidence.
409 F.2d at 65.
In Tucker v. Francis, 723 F.2d 1504, 1511-12 (11th Cir.1984), the Court addressed the question in the following language:
It is not fundamentally unfair to comment on the appellant's silence during the culpability phase as juxtaposed with his exculpatory testimony during the sentencing phase. A defendant is usually told that so long as he does not testify, his failure to testify will not be used against him. In this case, Richard Tucker's failure to testify was not used against him during that portion of his trial in which he invoked the fifth amendment. After he waived his fifth amendment privilege by testifying, any expectations of protection from adverse comment also were waived.
See also Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926); McGahee v. Massey, 667 F.2d 1357 (11th Cir.1982) on waiver.
We are of the opinion that the remarks of the prosecuting attorney did not constitute error, and, at the most, were harmless error.

VII.

THE DEFENDANT WAS SENTENCED UNDER A DEATH PENALTY STATUTE THAT DID NOT EXIST WHEN HE COMMITTED THE CAPITAL MURDER OR WHEN HE WAS ORIGINALLY TRIED, IN VIOLATION OF THE EX POST FACTO CLAUSES OF THE UNITED STATES AND MISSISSIPPI CONSTITUTIONS, AS WELL AS SECTION 99-19-1 OF THE MISSISSIPPI CODE.
Jordan contends here that his sentence of death is in violation of the ex post facto clauses of the United States and Mississippi Constitutions and Mississippi Code Annotated § 99-19-1 (1972). The very question was answered adversely to appellant in Irving v. State, 441 So.2d 846 (Miss. 1983). The Court said:
[W]e are of the opinion appellant has misapplied § 99-19-1. By its terms, the *483 statute comes to life only with respect to statutory changes "affecting the crime or its punishment." The 1977 amendments did not affect the substance of capital law but merely made changes in the procedures by which such cases were to be tried. Therefore, we do not find § 99-19-1 requires reversal in this case.
* * * * * *
... [T]he new statutes provided increased protection for capital defendants and the intent that all such defendants on trial after April 1977, should merit this protection. We are of the opinion the ex post facto contention is without merit.
441 So.2d at 852, 853.
In Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), the Court stated:
[T]he change in the statute was clearly procedural. The new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime.
* * * * * *
In this case, not only was the change in the law procedural, it was ameliorative. It is axiomatic that for a law to be ex post facto it must be more onerous than the prior law.
432 U.S. at 293-94, 97 S.Ct. at 2298-99.
The question was likewise decided in Gray v. State, 351 So.2d 1342 (Miss. 1977).

VIII.

THE TRIAL COURT ERRED BY REFUSING TO GRANT THE DEFENDANT AN EVIDENTIARY HEARING TO SUBSTANTIATE HIS CLAIM THAT THE DEATH PENALTY IS APPLIED IN MISSISSIPPI IN A DISCRIMINATORY MANNER BASED UPON THE RACE OF THE VICTIM.
Jordan contends that he was entitled to an evidentiary hearing to substantiate his claim that the death penalty is applied in Mississippi in a discriminatory manner based upon the race of the victim. The appellee states in its brief, "The allegation that the trial court denied defendant an evidentiary hearing to substantiate his claim that Mississippi has applied the death penalty in a racially discriminatory fashion is not only without support in the record, but also a blatant misstatement of the facts." Pages 216-22 of the record are cited as relating to argument on motion for evidentiary hearing. However, the motion discussed there (R. 216), related to a motion to impose a life sentence. At the conclusion of the discussion (argument), counsel for Jordan stated:
BY MR. HUDSON:
Your Honor, you had indicated prior to our starting that you were prepared to rule on our motion; the one that is pending on the imposition of the life sentence. We would ask that the court rule and the court give us an opinion on this decision.
BY THE COURT:
In my opinion, based upon the decision of the Fifth Circuit in remanding this matter back to be tried on the penalty phase, I feel like that I must overrule your motion and submit it to the jury on the issue of the penalty.
Therefore, it appears that Jordan's counsel did not press for hearing and ruling on the motion for an evidentiary hearing. In Booker v. State, 449 So.2d 209 (Miss. 1984), this Court said:
The appellant next contends that the arbitrary and discriminatory imposition of the death penalty in this case violates the Eighth and Fourteenth Amendments. Specifically, he contends that Blacks are much more likely to receive the death penalty than Whites.
Although the appellant raised this issue in his motion for a new trial, he failed to introduce any evidence in support of the contention. In Gordon v. State, 349 So.2d 554 (Miss. 1977), this Court held:
The general rule is that a motion is at issue without any further pleading, but the allegations thereof do not *484 amount to any proof of the facts stated therein. Shaw v. State, 188 Miss. 549, 195 So. 581 (1940). It devolves upon the movant to support his motion by proof. Reed v. State, 143 Miss. 686, 109 So. 715 (1926). It is also the rule that in the absence of proof in support of a motion, the presumption in favor of the correctness of the action of the trial court must prevail. Walters v. State, 127 Miss. 324, 90 So. 76 (1921).
449 So.2d at 221.[2]
We are of the opinion that there is no merit in this assignment of error.

IX.

DEFENSE COUNSEL WAS IMPERMISSIBLY RESTRICTED IN THE PRESENTATION OF MITIGATING EVIDENCE.
Jordan contends that the lower court impermissibly restricted testimony concerning mitigating facts which constitute reversible error. The witnesses are Robert Jordan, brother of appellant; Shirley Thames, first cousin; Lucius Brown, prison guard; and Rhett Russell.
The testimony of Robert H. Jordan consists of six record pages. He told about his relationship with appellant from boyhood through manhood. A sample of his testimony follows:
Well, I can state for a fact that my brother's a very fine man. We had a good relationship. He was a good man in the community, and he raised a good family. He went to church regular.
Following that testimony, Robert H. Jordan made a more detailed statement in which he complimented and lauded his brother as a good man.
Testimony objected to by the State was whether or not Robert H. Jordan knew his brother's reputation for peace and violence in the community and the trial judge permitted him to answer that question in the affirmative and state that the reputation was good. The only other objection was to testimony of the witness to the effect that "Well, I don't know. I believe that they should be ..." An objection was sustained as to what the witness believed and thought.
The direct examination of Shirley Thames consumes eight (8) pages of the record. She testified at length about the family background and life of Jordan when he was growing up. Objections were sustained to an answer of Mrs. Thames when she stated that Jordan was brought up in the church by his parents and then that she had never been in church service with him at any time; also, objections were sustained to the questions "What problem for your family has this matter created?" and, "Do you know, Mrs. Thames, about the family relationship between Gerald Jordan and his wife?"
The testimony of Officer Lucius Brown of the Maximum Security Unit consists of five (5) pages. He testified that he had requested, and appointed, Jordan as his hall man. He explained Jordan's duties in that capacity and was highly complimentary of everything Jordan did. Objections were sustained to questions asked Officer Brown as to placing trust in a person selected for the job of hall man, whether Jordan had demonstrated any violent tendencies in Maximum Security (question answered in the negative), questions as to how he would characterize Jordan's attitude, what the reputation of Jordan was for peace and violence in the Maximum Security Unit, and questions as to whether or not Jordan can be rehabilitated, and whether or not Jordan had engaged in fights on the yard.
Rhett Russell was called by the defense as a witness and, at a bench conference, the trial judge was informed of the substance of his testimony, the State objected thereto, and the court sustained the objection. Whereupon, the defense made the following proffer of Russell's testimony:

*485 BY THE COURT: Let the record show that Defense Counsel has offered the Honorable Rhett Russell as a witness. We had a conference here at the bench and I was informed a little about what he would testify to. And the State objected to it and I sustained it. But I have offered the Defense Attorneys an opportunity to make a record on his testimony.
BY MR. KILBRETH: Your Honor, if permitted to testify, Mr. Russell would testify about a method for generating electricity from an alternative energy source, as it is known; through wind tunnels and things of that nature. Mr. Jordan has been in contact with the Tennessee Valley Authority over this invention and has entered into an agreement with them about it. And Mr. Russell is familiar with all those details and would testify about that.
BY THE COURT: This is some thoughts and ideas that have been developed by Mr. Jordan since he has been in prison; is that right?
BY MR. KILBRETH: That is correct, Your Honor.
In Jackson v. State, at page 1256 (1976), this Court said:
[T]he defendant ... may also adduce proof of any other circumstance or combination of circumstances surrounding his life and character or the commission of the offense with which he is charged that would be reasonably relevant to the question of whether he should suffer death or be sentenced to life in prison.
The United States Supreme Court said in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978):
[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.
438 U.S. at 605, 98 S.Ct. at 2964-65, 57 L.Ed.2d at 990. See also Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).
The question presented here is whether or not the testimony proposed to be introduced, and which was excluded by the lower court, was competent and reasonably relevant to the question of whether or not Jordan should suffer death or be sentenced to life in prison. Robert Jordan, Shirley Thames, and Officer Lucius Brown testified in detail as to circumstances surrounding the life and character of Jordan. Objections to certain questions were sustained, and we think properly so, because they were not competent and reasonably relevant to the issue.
Referring to the above statement of the court in sustaining an objection to the testimony of Rhett Russell, it appears that the court offered the defense attorneys an opportunity to make a record on his testimony. The record does not indicate what was said to the judge at the bench conference about the testimony of Russell. Instead of making a record as permitted by the court, appellant's counsel made a proffer of what was intended to be shown by Russell's testimony. From that proffer, it appears that his testimony would have been hearsay and inadmissible. However, we are of the opinion that such testimony would not be reasonably relevant to the question of whether Jordan should suffer death or be sentenced to life imprisonment.
Jordan took the stand and testified at length in his own behalf. He was not interrogated by his counsel as to, nor did he attempt to testify to, the matters sought to be elicited from Rhett Russell. Had Jordan so testified, it would not have been objectionable on the ground of hearsay testimony, and he may have been able to establish it as being relevant in his behalf. Having failed to offer such testimony in evidence, we do not think that he can now complain that the court erred in excluding the testimony of Russell. Therefore, we hold that the lower court did not commit *486 reversible error in excluding the testimony under this assignment.

X.

THE TRIAL JUDGE ERRED IN ADMITTING THE OPINION TESTIMONY OF DAVE MELTON, A NON-EXPERT, WITHOUT FIRST ALLOWING VOIR DIRE AS TO HIS QUALIFICATIONS.
Jordan contends that the witness Dave Melton was not qualified as an expert for the State and that admitting his testimony constituted reversible error, particularly since the court did not permit Jordan's counsel to voir dire Melton before he testified. The court permitted Melton to testify about bloodstains and blood spatters found at the scene of the homicide. The record reflects that he had a week's training in 1973 under a Dr. McDonald, who was an authority in such field, and that he had on-the-job experience since that time. We have read the record carefully scrutinizing the qualifications and testimony of Mr. Melton, and we are satisfied that the lower court committed no reversible error in permitting him to testify as an expert. In Waycaster v. State, 185 Miss. 25, 187 So. 205 (1939), the Court stated: "[T]he trial court determines the competency of the witnesses, whether expert or non-expert, to testify, and the weight to be given to the opinion of the witness, if competent, is for the jury alone." 185 Miss. at 35, 187 So. at 208.
In Grinnell v. State, 230 So.2d 555 (Miss. 1970), the Court said:
The rule is well established that the question of the qualification of a witness to speak as an expert lies largely in the discretion of the trial court, and its determination that a witness is qualified to speak will not be reversed unless it clearly appears that the witness was not qualified... . The jury, of course, was free to accept or disregard it.
230 So.2d at 557-558.
In Floyd v. State, 166 Miss. 15, 148 So. 226 (1933), this Court said: "[T]o testify as an expert a witness need not be infallible, or possess the highest degree of skill, it being generally sufficient that he possess peculiar knowledge respecting matter involved not likely to be possessed by the ordinary layman." 166 Miss. at 37, 148 So. at 231.
The proper procedure and policy when an expert witness is offered is for the court to permit qualification by the party offering the expert witness, and then to permit voir dire by the opposite party before ruling on the competency of the witness. Here, the failure of the lower court to follow that procedure does not constitute reversible error. During cross-examination, Jordan's counsel thoroughly interrogated Melton about his training and experience, then cross-examined him concerning his direct testimony. Counsel apparently was satisfied at that time with his competency because he did not renew his objection to the testimony or move to exclude such testimony. Further, a layman or a member of the jury, after hearing and seeing a description of the bloodstains, using common knowledge and experience, could have arrived at the same conclusion of Melton. We find no prejudice resulting to the appellant Jordan for failure of the lower court to permit his counsel to voir dire Melton at the outset of his testimony.

XI.

THE DEATH PENALTY IMPOSED IN THIS CASE IS DISPROPORTIONATE TO THE PENALTIES IMPOSED IN OTHER CAPITAL MURDER CASES IN MISSISSIPPI.
Jordan contends under this assignment (1) that this Court has interpreted the statute too narrowly by confining its proportionality review to cases in which the death penalty was imposed. In Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the Court held that such a review is not constitutionally mandated. In Gray v. Lucas, 677 F.2d 1086 (5th Cir.1982), the Fifth Circuit said:

*487 Gray claims that the Mississippi Supreme Court's comparative review of death sentences is flawed since the court only compared Gray's case with those cases where the death sentence had been imposed and not with all the cases where it could have been imposed. Because the Supreme Court has rejected a similar argument in Proffitt v. Florida, 428 U.S. 242, 258-59 fn. 16, 96 S.Ct. 2960, 2969-70 fn. 16, 49 L.Ed.2d 913 (1976), we reject this claim as well.
677 F.2d at 1111.
Jordan contends (2) that even if this Court reviews only cases in which the death penalty was imposed, it should conclude that the death sentence is excessive and disproportionate in this case. In Jordan v. State, 365 So.2d 1198, 1206, 1207 (Miss. 1978), decided November 22, 1978, this Court reviewed Mississippi cases to that time for the purpose of determining whether or not the sentence of death was excessive and disproportionate as to Jordan. We now have reviewed those cases under consideration by this Court since Jordan, supra, and both reviews have convinced us that the death penalty here is not excessive when the aggravating and mitigating circumstances are weighed against each other and that infliction of the death penalty here will not be either wanton or freakish and will be consistent and evenhanded with other death penalty cases previously affirmed by this Court. Therefore, we reject this assignment of error.
Finding that there are no reversible errors in the record, the judgment of the lower court is affirmed and Wednesday, the 6th day of March, 1985, is fixed as the date for execution of the death penalty in the manner provided by law.
AFFIRMED.
PATTERSON, C.J., WALKER, P.J., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur as to Parts I-VIII, and Parts X-XI.
As to Part IX: PATTERSON, C.J., WALKER, P.J., and DAN M. LEE, and ANDERSON, JJ., concur.
ROBERTSON, HAWKINS, SULLIVAN and PRATHER, JJ., dissent.
ROBERTSON, Justice, concurring in part, dissenting in part.
Though much dust remains to be settled in the increasingly complex area of death penalty litigation, the ground rules in one area have been made reasonably clear. At the sentencing hearing, the convicted capital murderer may offer almost anything which in his view might move one or more jurors to vote against the penalty of death.
The point was most authoritatively put in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978):
The Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence less than death.
438 U.S. at 604, 98 S.Ct. at 2964-2965, 57 L.Ed.2d at 990.
The rule was reaffirmed in Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and in numerous cases since then.
The record reflects that at the sentencing hearing below Jordan offered to prove that he had invented a unique method of generating electricity from an alternative energy source through the use of wind tunnels and that he had entered into an agreement with the Tennessee Valley Authority with respect to the development and use of that invention. This was an invention developed by Jordan since he has been incarcerated at the maximum security unit at the Mississippi State Penitentiary. The obvious purpose of the testimony was to show a positive side of Jordan's character, that he had made an important contribution to society and, presumably, that he was capable of making further such contributions.
*488 In the hands of skillful defense counsel, the point, of course, could have been argued in various ways. That Jordan had made the invention after he was in prison is arguably evidence of a changed person who is committed to seeking atonement for his crimes by doing good. That Jordan was able to do this while incarcerated at the maximum security unit at the Mississippi State Penitentiary demonstrates that Jordan has the resourcefulness to make such beneficial contributions while confined, that putting him back on the streets is unnecessary to enable him to perform his acts of atonement.
The problem here is that the trial judge did not allow the testimony.
I am confident that there is not a single member of this court who, had he or she been sitting as the trial judge in this case, would have precluded the offering of the evidence in question. Because the trial judge was correct on all other points and because this case has been dragging on for so long,[1] I do not think it unfair or inaccurate to suggest that the majority has succumbed to the quite human temptation to sweep this error under the rug and, if you will, cut a corner or two. I will try briefly to demonstrate my point.
To begin with, the fact that Jordan has made his invention since the commission of the crime and since his incarceration certainly does not deprive the evidence of admissibility. We have held repeatedly that bad things that a capital defendant does after his crime may be shown as aggravating circumstances. See, e.g., Tokman v. State, 435 So.2d 664, 668 (Miss. 1983); Jones v. State, 381 So.2d 983, 994 (Miss. 1980). It certainly follows that good things the defendant does after the commission of his crime may be shown in mitigation.
Several of our sister states have considered whether evidence that a defendant has attempted to rehabilitate himself or be productive with his time while in prison is a mitigating circumstance and each has held that such evidence may be so considered. For example, Arizona has read Lockett and Eddings to require consideration by the sentencer of evidence that the defendant had done a great deal of soul searching since the crime, had been a model prisoner, had set positive new goals for himself and had attempted to further his education while incarcerated. State v. Gretzler, 135 Ariz. 42, 58, 659 P.2d 1, 14 (1983); State v. Watson, 129 Ariz. 60, 63-64, 628 P.2d 943, 947 (1981).
South Carolina holds that a capital defendant's behavior while in prison "is relevant because it does bear upon a defendant's character". State v. Stewart, 320 S.E.2d 447, 450 (S.C. 1984). Moreover, Florida has construed Lockett to mean that
a person's potential for rehabilitation is an element of his character and therefore may not be excluded from consideration as a possible mitigating factor.

Simmons v. State, 419 So.2d 316, 320 (Fla. 1982)
Evidence of future dangerousness is relevant as an aggravating circumstance, as we have held in Leatherwood v. State, 435 So.2d 645, 652 (Miss. 1983). Leatherwood relies upon Jones v. State which states:

*489 In our opinion, the legislature undoubtedly intended a weighing of both at the time of sentencing so the past behavioral patterns likely to affect the defendant's future behavior might be evaluated by the jury in deciding whether the defendant will live or die. We think there is no more justification for terminating consideration of the defendant's criminal behavior at the time of the offense than there is for terminating consideration of favorable behavior at that time.
 381 So.2d 983, 994 (Miss. 1980) (Walker, J.); see Reddix v. State, 381 So.2d 999, 1010 (Miss. 1980) (quoting Jones).
As Jones indicates, it surely follows that evidence of a potential for doing good in the future is likewise relevant.
At trial Jordan attempted to offer the evidence of his invention through a witness named Rhett Russell. One of the inadequacies the majority finds in the proffered evidence is the notion that Russell's testimony "would have been hearsay and inadmissible". For two reasons, the point won't wash. First, because the nature of the sentencing hearing is unique, we are constitutionally prohibited from a "mechanistic" enforcement of the hearsay rule. Green v. Georgia, 442 U.S. 95, 97, 99 S.Ct. 2150, 2151-52, 60 L.Ed.2d 738, 741 (1979). Second, there is nothing in the record from which the majority could rationally conclude that Russell's testimony would have been hearsay. The proffer made by defense counsel was that "Mr. Russell is familiar with all those details and would testify about that". Nothing in the record suggests that the trial judge regarded Mr. Russell's proffered testimony as hearsay or rejected it on that basis.
Another red herring invoked by the majority is that Jordan took the stand and testified at length on his own behalf but did not attempt to describe the invention at issue here. There are two altogether sufficient answers here as well. First, we know of no rule of law under which an error in refusal of admission of competent evidence would be said to be cured by the fact that the party had another, subsequent opportunity to offer the same evidence and failed to do so. The majority cites neither authority nor logic for its point and we suggest that none may be found.
There is a more practical answer to the majority's point. Defense counsel offered the Russell testimony prior to calling Jordan as a witness in his own behalf. In spite of the majority's speculations about hearsay, it is clear from the record that the trial judge refused this testimony on its merits; that is, he regarded the testimony as objectionable on relevancy grounds, not form. Defense counsel reasonably should have regarded that the trial court had held that evidence of the invention was inadmissible, period. Indeed, there is no other reasonable interpretation of the state of things following the trial court's ruling on the Russell testimony. Seen in this light, the majority can only be saying that trial counsel should be faulted for failing to continue to press a point of law upon which the trial judge had already ruled. Although it would not have been improper for defense counsel to "try again", no waiver attaches to the point when all counsel does is show respect for the trial court and its prior rulings. See Stong v. Freeman Truck Line, Inc., 456 So.2d 698, 711 (Miss. 1984); Jones v. State, 461 So.2d 686, 702 (Miss. 1984).
Our law is clear that, when a party seeks to offer testimony and that testimony is rejected by the trial judge, that party, if he wishes to preserve the point for appeal, must place in the record the substance of what the excluded testimony would have been. See, e.g., Dazet v. Bass, 254 So.2d 183, 187-188 (Miss. 1971). This is for the obvious purpose of enabling this Court on appeal to consider whether the excluded testimony was of any real consequence.
Our law is also clear that the party may make his offer of proof in one of two forms. First, he may call the witness outside the hearing of the jury and in question-and-answer form present what the testimony would have been. Alternatively, counsel may simply state for the record that if the witness had been allowed to *490 testify, he would have stated such and such, setting forth the general outlines of the proffered testimony. We emphasize the availability of this latter procedure, for the majority appears to fault Jordan for not making his proffer in question-and-answer form.
We have repeatedly recognized that a wholly effective, albeit alternative, method of preserving an exclusion of evidence point for appeal is dictation into the record of "a statement ... to indicate what was proposed to be shown by the examination." McGee v. State, 365 So.2d 302, 304 (Miss. 1978); see also Bell v. State, 443 So.2d 16, 20 (Miss. 1983); Martin v. Wadlington, 337 So.2d 706, 708 (Miss. 1976); Kinney v. State, 336 So.2d 493, 495 (Miss. 1976).
In Murray v. Payne, 437 So.2d 47 (Miss. 1983), we summed up the matter.
All we require is that the party offering the excluded testimony make a clear record showing to us that there is substance to his point, that on reversal and remand there is a substantial likelihood that he will be able to offer evidence which may reasonably be expected to have an impact on the outcome of the case. We do not require that the appealing party place in the record the total and complete details of the proffered but excluded testimony. Nor do we require certainty that exclusion of that testimony affected the outcome of the first trial. 437 So.2d at 55.
In Murray we even expressed our preference for the statement by counsel method of preserving the record, referring to examination of the witness as "the more cumbersome" method. 437 So.2d at 55.
In the case at bar, the defense sought to call Rhett Russell as a witness. A bench conference was held whereupon the trial judge remarked
I was informed a little about what he would testify to. And the State objected to it and I sustained it. But I have offered the defense attorneys an opportunity to make a record on his testimony.
At this point, defense counsel stated for the record that,
If permitted to testify, Mr. Russell would testify about a method for generating electricity from an alternative energy source, as it is known; through wind tunnels and things of that nature. Mr. Jordan has been in contact with the Tennessee Valley Authority over this invention and has entered into an agreement with them about it. And Mr. Russell is familiar with all those details and would testify about that.
This is a perfectly acceptable proffer, no doubt comparable to many which we have held sufficient to preserve an evidentiary exclusion point for consideration on appeal.
The bottom line holding of the majority is:
We are of the opinion that such testimony would not be reasonably relevant to the question of whether Jordan should suffer death or be sentenced to life imprisonment.
No basis in fact, reason or legal authority is offered for this conclusion. Why is evidence that Jordan may have made a useful invention  and presumably, has the ability to make more  not relevant to the question of whether he should suffer death? We are simply not told.
It is with a certain amount of awe that any person contemplates the matter of whether he should vote that a fellow human being should die. What factors inform the making of that decision will no doubt differ from one person to the next. Having been required to consider more than half a hundred cases from across this state wherein some juries have decided that capital murderers should die and others on seemingly comparable facts have decided that other capital murderers should live, I will certainly not presume to know any authoritative check list of just what goes through a juror's mind when facing this decision.
I can say with confidence, however, that there are not just a few persons within our society who, faced as a juror with a life or death determination, would regard it as relevant that the defendant, since his crime *491 and incarceration, had applied his wit and ingenuity and made an invention that would benefit society. Not all of us are without the capacity to see as proper the amelioration of the harshness of the law in the face of genuine repentence, pursuit of atonement and demonstrably responsible behavior.
What is most disturbing about the majority decision is that it would, if carried to its logical extreme in the future, operate as a matter of law to deprive society of the benefits it could well derive from the continued life of one convicted of capital murder. History has recorded the names of numbers of persons who have in their youth committed heinous and atrocious crimes and, escaping the hangman, gone on to lead productive and useful lives, albeit behind bars. Nathan Leopold participated in the thrill killing of little Bobby Franks in Chicago in the early 1920s and, after he escaped the gallows largely through the eloquence of Clarence Darrow, went on to make important humanitarian contributions in the fields of science and medicine. N. Leopold, Life plus 99 Years 305-38 (1958). Several decades ago there was popularized the life of Robert Stroud, the birdman of Alcatraz, a convicted murderer, who following reprieve made important contributions to avarian science. There have no doubt been others. While most capital murderers do not have such creative capacities in their character and personality, there is no reason why we should arbitrarily deprive society of the benefits of the continued life of those who do.
The point, in a nutshell, is this. One of the fundamental thrusts of the last ten years of death penalty litigation has been establishment of the premise that the awesome decision of life or death should be committed to the jury as a representative of the collective conscience of the community. Through juries the contemporary values of society are infused into the decision making process. Gregg v. Georgia, 428 U.S. 153, 179-182, 96 S.Ct. 2909, 2928-29, 49 L.Ed.2d 859, 878-79 (1976); Woodson v. North Carolina, 428 U.S. 280, 295, 96 S.Ct. 2978, 2986-87, 49 L.Ed.2d 944, 955-956 (1976). We have been quick to reject efforts to infuse arbitrary factors into the sentencing process, factors that would deflect from the jury any substantial part of its awesome decision-making responsibility in death penalty cases. Wiley v. State, 449 So.2d 756, 761-763 (Miss. 1984); Williams v. State, 445 So.2d 798, 810-814 (Miss. 1984).
It is in the foregoing context that we recall the mandate of Lockett and Eddings that the sentencing jury
not be precluded from considering, as a mitigating factor, any aspect of the defendant's character ... that the defendant offers as a basis for a sentence less than death.
438 U.S. at 604, 98 S.Ct. at 2964-65, 57 L.Ed.2d at 990.
For this Court to hold as a matter of law that the making of a socially useful invention is not a relevant mitigating circumstance is at absolute cross purposes with the force of the logic of Gregg and Woodson and Lockett and Eddings and all of the others. More important, it is, as we perceive the present state of the law, constitutionally impermissible, with the unfortunate ultimate result that this case is now destined to drag on even longer than would have been the case had the majority been willing to bite the bullet and correctly apply Lockett to the facts at hand.
I concur in what has been said by the majority on all other issues, I would hold, however, that the trial judge impermissibly restricted Jordan in his presentation of mitigating circumstances. I would reverse and remand for a new hearing on the question of sentence where Jordan's rights under Lockett and Eddings would be fully respected.
HAWKINS, PRATHER and SULLIVAN, join this opinion.
HAWKINS, Justice, joining Justice ROBERTSON:
I am compelled to join Justice Robertson in what I must view as unassailable reasoning.
*492 Justice Robertson names men who significantly contributed to humanity despite having previously committed murder. Diffidently, I would add two more, David[1] and Solomon.[2]
History repeatedly teaches us that humanity's benefactors have not been limited to those mortals who never committed serious transgressions or were totally sane.
The jury was entitled to hear this testimony.
NOTES
[1] Jordan had dressed and disguised himself as an electrical inspector.
[2] Jordan and Mrs. Marter are members of the white race.
[1] Originally, Jordan was indicted March 26, 1976, for a killing that occurred January 13, 1976. He was prosecuted, convicted and sentenced to death at a trial which ended July 21, 1976. His motion for a new trial was sustained October 27, 1976, in view of Jackson v. State, 337 So.2d 1242 (Miss. 1976). At retrial Jordan was again sentenced to death. His direct appeal to this Court affirmed his sentence. Jordan v. State, 365 So.2d 1198, 1207 (Miss. 1979) (rehearing denied without opinion). Petition for Writ of Certiorari to the United States Supreme Court was denied. Jordan v. State, 444 U.S. 885, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979). Jordan's petition to this Court for error corum nobis relief was denied. In re Jordan, 390 So.2d 584, 588 (Miss. 1980). While state error corum nobis proceedings were pending, Jordan filed a federal habeas corpus action in the Southern District of Mississippi. When the District Court denied relief without published opinion, appeal was taken to the Fifth Circuit Court of Appeals where Jordan's death sentence was vacated. Jordan v. Watkins, 681 F.2d 1067, 1083, reh'g denied sub nom. Jordan v. Thigpen, 688 F.2d 395, 396 (5th Cir.1982). At the resentencing hearing on April 29, 1983, Jordan was again sentenced to death. It is this sentence he appeals here.
[1] II Samuel 11:14-17 (his lover's husband).
[2] I Kings 2:22-25 (his half brother).