437 So.2d 47 (1983)
Charles Larry MURRAY
v.
Cecil H. PAYNE and James M. Flanagan.
No. 54393.
Supreme Court of Mississippi.
September 7, 1983.
*49 Conrad Mord, Breed O. Mounger, Jr., Tylertown, for appellant.
J. Hal Ross, Brandon, Joseph M. Stinson, Tylertown, for appellee.
Before WALKER, P.J., and HAWKINS and ROBERTSON, JJ.
ROBERTSON, Justice, for the Court:

I.
This case presents questions respecting the duties of guarantors who pay the maker's secured note and pending disposition of the collateral use it to make a profit. The guarantors, statutory subrogees by virtue of their having honored their guaranty obligations in favor of the secured party bank, liquidated the collateral and have here sued the maker for a deficiency judgment. The maker claims setoff for profits earned by the guarantors while the collateral was in their possession and used by them prior to sale.
After less than timely objection, the trial judge excluded all evidence of profits. Judgment was entered in favor of the two guarantors after jury verdict for $4,620.00, the amount of the deficiency sued for. Claiming that the two guarantors had an obligation to credit all profits derived from their use of the collateral to the underlying debt  and, therefore, that he should have been allowed to offer proof as to the nature and extent of those profits, the maker appeals. We reverse.

II.

A.
There are three principal players in this civil action.
(a) Charles Larry Murray (hereinafter "Murray") is an adult resident citizen of Walthall County, Mississippi, who was the Defendant below and is the Appellant here. Murray was the maker and primary obligor on the promissory note, default in the payment of which set in motion the chain of events which led to this civil action.
(b) Cecil H. Payne (hereinafter "Payne") and James M. Flanagan (hereinafter "Flanagan") are adult resident citizens of Rankin County, Mississippi, who were the Plaintiffs below and are the Appellees here. Payne and Flanagan were guarantors of the note in issue.
From May, 1974, until November 13, 1976, Murray, Payne and Flanagan did business as partners using the trade name Rankin County Flying Service. They were engaged in an agri-flying or crop dusting business. In November of 1976, Murray withdrew from the partnership. Incident thereto, Murray took title to a Grumman *50 G-164A airplane previously owned by the partnership. The plane was at that time subject to a purchase money security interest and debt held by Rankin County Bank in Brandon, Mississippi, of approximately $14,000.00. Murray assumed all obligations incident thereto.
Murray determined to establish a new business. He would provide air conditioning equipment, installation and servicing for airplanes. To obtain start up and operating capital, Murray negotiated a loan from the Rankin County Bank. The new loan to Murray was combined with a refinancing of the then outstanding original purchase money indebtedness on the Grumman which Murray had assumed following the dissolution of the partnership. The loan was closed on December 1, 1976, when Murray executed in favor of Rankin County Bank his promissory note in the principal amount of $36,479.99, plus interest. The note was payable in eight months, to be specific, on July 29, 1977. As security for the note, Murray gave to the bank a valid, enforceable and perfected security interest in the Grumman airplane.
On the same date, December 1, 1976, Payne and Flanagan executed a guaranty agreement in favor of the bank. Without qualification or equivocation, Payne and Flanagan guaranteed payment of Murray's $36,479.99 note, together with interest and expenses of collection and including renewals and extensions thereof.
As fate would have it, Murray did not pay the note when due. The Rankin County Bank called upon Payne and Flanagan to honor their obligations under their guaranty agreement. Payne and Flanagan responded. They reached an agreement with the bank that they would attempt to sell the collateral, the Grumman airplane, and raise enough money to pay the debt. Exercising remedies lawfully vested in it by virtue of Murray's default, the bank took possession of its collateral and authorized Payne and Flanagan to negotiate a sale.
Payne and Flanagan originally advertised the Grumman for sale at $40,000.00. They found no buyers. In May of 1978, they negotiated a deal with a purchaser in Greenwood, Mississippi. The more valuable Grumman was traded for a smaller Cessna airplane plus $20,000.00 cash.[1] This transaction was consumated, and no challenge is made concerning its commercial reasonableness.[2]
On May 25, 1978, Payne and Flanagan took the $20,000.00 and delivered it to the bank which applied it to reduce the Murray note. They then gave their own note to the bank in the principal amount of $21,801.27. This note was a renewal of the principal and interest then outstanding on the original December 1, 1976, note made by Murray. It was payable one year from date, to-wit, on May 25, 1979. The bank, of course, had released its security interest in the Grumman but as security for this new note, took a security interest in the Cessna. *51 The Cessna in fact and in law became substitute security in the place and stead of the Grumman.[3] The understanding was that Payne and Flanagan would now try to sell the Cessna as soon as feasible, and discharge the remaining balance of the original Murray note, as now renewed by the Payne and Flanagan note.
The facts pertinent to the principal issue raised on this appeal occur at this point. The Cessna airplane was in the custody of Payne and Flanagan. Payne and Flanagan were still in the agri-flying business. While seeking a sale for the Cessna, they used it as a spare plane in their business. Payne testified that it was flown approximately 100 hours by them over a two month period. Payne also testified that they had rented an airplane like this for $19.00 an hour to fly an ant contract for the State of Mississippi. He stated that ordinarily, however, he would not charge for this plane by the hour, but by the acre covered and the amount of fertilizer or water applied. He stated that he would normally charge on an hourly basis and that actual charges to the customers would range between $100.00 and $150.00 per hour.
Thereafter, Payne and Flanagan sold the Cessna for $17,500, which amount was immediately delivered to the Rankin County Bank. Again, there is no question of the commercial reasonableness of the sale of this substituted collateral.[4] After interest and expense calculations have been made, and after the $17,500 had been applied to the indebtedness, there remained due and owing to the bank, traceable back to the original Murray note, the sum of $4,620. On July 21, 1978, Payne and Flanagan each paid the bank from their personal funds the sum of $2,310. The original Murray indebtedness to the Rankin County Bank was thus discharged in full.

B.
On April 3, 1981, Cecil H. Payne and James M. Flanagan brought this civil action by filing their declaration in the Circuit Court of Walthall County, Mississippi. They recited briefly the history stated above and asked that Murray be required to indemnify them for what they had been required to pay under their guaranty agreement. They specifically demanded judgment of and from Murray in the amount of $4,620.
In due course, Murray filed his answer. In a counterclaim he asserted that Payne and Flanagan had had the use of both the Grumman and the Cessna and that he, Murray, was entitled to a credit for the profits realized from utilization of these two airplanes.
The case was called for trial in the Circuit Court of Walthall County at the February 1982 Term thereof, Honorable Joe N. Pigott, Circuit Judge, presiding. On February 1, 1982, the jury returned a verdict in favor of Payne and Flanagan in the amount of $4,620. On February 8, 1982, final judgment was entered on the jury verdict. After Murray's motion for a new trial was overruled and denied, this appeal has followed.

III.
The primary issue tendered on this appeal is whether Murray is entitled to credit or setoff for the amount of profits earned by Payne and Flanagan through their use of the collateral. We are here concerned only *52 with the Cessna which, as explained above, was substitute collateral.[5] Our time frame, if we understand the record correctly, is May 25, 1978, the date the Cessna was acquired, until July 21, 1978, the date the Cessna was sold to Payne and Flanagan's new partnership.

A.
Initially, we inquire concerning the rights, if any, these sureties have against the original maker to recover a deficiency between the sum received upon disposition of the collateral and the amount due on the note. Our inquiry, obviously, is one which must be made within the four corners of the Uniform Commercial Code, as adopted in this state. Miss. Code Ann. §§ 75-1-101, et seq. (Supp. 1982).
Payne and Flanagan were guarantors, or sureties, on the note executed by Murray. The contract of guaranty provided that, upon default on the note by its maker, Payne and Flanagan would pay the note along with any charges incurred by the bank in collection. Having signed in that capacity, Payne and Flanagan are accommodation parties and their rights and duties are governed by Miss. Code Ann. §§ 75-3-415, 75-3-416 and 75-3-606 (Supp. 1982). When the facts of this case are considered under these sections, there is no question but that Payne and Flanagan have fulfilled their obligations to the bank by paying the note after the maker defaulted.
Under the above circumstances, accommodation parties do have the right to proceed against the maker for a deficiency. The law provides:
(1) An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it.
(2) An accommodation party is not liable to the party accommodated, and if he pays the instrument has a right of recourse on the instrument against such party. Miss. Code Ann. § 75-3-415 (Supp. 1982).
Payne and Flanagan are sureties, and because they are sureties they are accommodation parties. A surety's right of subrogation, recognized by the above statute, is his equitable right to assert the rights of the creditor against the debtor. Upon payment, the surety is said to "stand in the shoes" of the creditor.
Not only is the accommodation party entitled to sue the maker of a note to recover the amount that the accommodation party ends up paying, but he is also entitled to any collateral securing the note. In Reimann v. Hybertsen, 275 Or. 235, 550 P.2d 436 (1976), a surety, who had paid off a note, brought suit against the original creditor for his failure to assign mortgages securing the original note to the party who paid them off. The court found that the accommodation party did have such a right. It found:
"Against the creditor, the right is strictly equitable and is simply a right that the creditor assign to the surety his claim against the principal, as well as any security held by him." quoting Simpson on Suretyship, 206-07, ch. 2 § 47 [550 P.2d at 437].
To like effect, see Anna National Bank v. Wingate, 63 Ill. App.3d 676, 21 Ill.Dec. 84, 381 N.E.2d 19 (1978); Simson v. Bilderbeck, 76 N.M. 667, 417 P.2d 803 (1966). Once an accommodation party has paid a note and received the collateral securing it, he is subject to the same rights and obligations the creditor had with regard to disposition of the collateral. Miss. Code Ann. § 75-9-504(5) (Supp. 1982).

B.
Disposition of the issue tendered is ultimately controlled by Article 9 of the Uniform *53 Commercial Code.[6] Miss. Code Ann. §§ 75-9-101, et seq. (Supp. 1982).
First, Payne and Flanagan became statutory subrogees. When the bank called on them to honor their obligations under their guaranty agreement, and when they responded, Payne and Flanagan became subrogated to the Bank's rights against Murray. Miss. Code Ann. § 75-9-504(5) (Supp. 1982) provides:
A person who is liable to a secured party under a guaranty, endorsement, repurchase agreement or the like, and who receives a transfer of collateral from the secured party or is subrogated to his rights has thereafter the rights and duties of the secured party.
With respect to the collateral, Payne and Flanagan succeeded to the rights and duties of the Rankin County Bank. To determine what those duties are, we turn to Miss. Code Ann. § 75-9-501(1) (Supp. 1982) which provides in pertinent part:
A secured party in possession has the rights, remedies and duties provided in Section 75-9-207.
Payne and Flanagan, of course, were in possession of the Cessna. By virtue of § 9-504(5), they stepped into the shoes of the secured party. For purposes of this case, Payne and Flanagan were secured parties in possession.
The rights and responsibilities of a secured party in possession are set out in Miss. Code Ann. § 75-9-207 (Supp. 1982).[7] Our specific concern is with Section 75-9-207(2)(c) which provides:
Unless otherwise agreed, when collateral is in the secured party's possession, ... the secured party may hold as additional security any increase or profits (except money) received from the collateral, but money so received, unless remitted to the debtor, shall be applied in reduction of the secured obligation; ... . [Emphasis added].
Keeping in mind that, by virtue of Section 9-504(5), Payne and Flanagan stand in the shoes of the secured party, we find it inescapable that they were obligated under Section 9-207(2)(c) to apply profits received in reduction of the secured obligation. At the time of their use of the substituted collateral, Payne and Flanagan were operating under their note to the bank dated May 25, 1978, a renewal note. Still there is no question but that the phrase "the secured obligation" in the statute covers all obligations of the parties owing to the Rankin County Bank arising out of the original note of December 1, 1976, including all extensions and renewals thereof.
We have only one prior decision construing a secured party's obligations under Section 9-207: Vinson v. McCarty, 413 So.2d *54 1026 (Miss. 1982). The Vinson case recognizes the general obligation of the secured party in possession of collateral to act with reasonable diligence and in good faith to preserve the collateral and to deal fairly with the debtor. The facts of the Vinson case, however, as well as the precise legal issues tendered, offer no real aid here.
The notion that a secured party in possession is, under UCC Article 9, obligated to the debtor to account for profits and to apply profits to the debt secured was recognized in Madsen v. Prudential Federal Savings & Loan Assn., 558 P.2d 1337, 1340 (Utah 1977). In Madsen, the Supreme Court of Utah recognizes that this general legal premise may be traced back to the early days of the common law pledge, long before anyone ever dreamt of the Uniform Commercial Code. For example, as long ago as 1929, the rule was stated in 21 Ruling Case Law, Pledge 665-666, § 28, as follows:
If from the use of the property pledged profits are derived, the pledgee must in the absence of a special agreement to the contrary, account therefor to the pledgor, and apply the net proceeds of such use to the extinction of the debt. So if any profits accrue from the property held as collateral, such profits, while they may be collected and retained by the pledgee, must be credited to the pledgor, or applied to the sum due from him, ... .
The Madsen court goes on to add:
The foregoing principles of the law of pledge are not new. Indeed, Madsen's counsel cites the Code of Manu and that of Hammurabi, for early examples [fn. 2] I.A. Rocureck and J.S. Wigmore, Source of Ancient and Primitive Law, p. 401 (1915). These principles have not been discarded. 558 P.2d at 1340.
The same rule[8] is found in the Restatement of Security, § 27, p. 91:
The pledgee has the duty to account to the pledgor for the increase or profits accruing to the pledgee as a result of the possession of the pledged chattel.
Madsen, of course, concludes by recognizing that the rule has now been brought forward and expressly included in Section 9-207(2) of the Uniform Commercial Code. And, to be sure that the applicability of the rules stated above to this case is not lost, Flanagan and Payne are statutory subrogees by virtue of Section 9-504(5) and, to the extent that they held possession of the Cessna as substituted collateral, they stood in the eyes of the law as pledgees in possession, with the attendant obligation to account for profits.[9]

C.
A point needs to be made crystal clear here. We are talking about net profits. In no way is Murray entitled to a credit for all gross receipts of Payne and Flanagan from the use of the substituted collateral. Murray is entitled to credit in the amount of the net profits attributable to Payne and Flanagan's use of the Cessna airplane.[10] We have no doubt that it can be ascertained, in accordance with generally accepted accounting principles, what part of the net earnings from the use of the Cessna *55 are attributable to the airplane itself, and the efforts and industry of Payne and Flanagan.
On the authority of Section 9-207(2)(c), as construed above, the Circuit Court erred in refusing to allow the jury to consider evidence of profits earned by Payne and Flanagan through the use of the Cessna airplane.

IV.
In reply, Payne and Flanagan argue that this Court should not reverse because Murray's counsel failed to make his record at trial sufficient to preserve the point for appeal. They urge that, once the Circuit Judge sustained the objection to the proof respecting profits, it was then incumbent upon Murray to place in the record what his proof would have been. This is frequently done by counsel's dictation into the record of a statement of what his proof would have shown had he been allowed to offer it. The more cumbersome way to do this, of course, is for the witness, outside the presence of the jury, to be allowed to testify.
Payne and Flanagan are correct that, under the clearly established decisions of this Court, we require that, before we will reverse, the complaining party preserve and advise us through the record just what the excluded testimony would have been. See, e.g., Foster v. Miss. State Highway Commission, 244 Miss. 57, 140 So.2d 267, 271 (1962); Dazet v. Bass, 254 So.2d 183, 187-188 (Miss. 1971); Martin v. Wadlington, 337 So.2d 706 (Miss. 1976). The rule, however, is not nearly so wooden as counsel argues.
It is not necessary that the parties place in the record every detail of what their proof would have shown. All we require is that the party offering the excluded testimony make a clear record showing to us that there is substance to his point, that on reversal and remand there is a substantial likelihood that he will be able to offer evidence which may reasonably be expected to have an impact on the outcome of the case. We do not require that the appealing party place in the record the total and complete details of the proffered but excluded testimony. Nor do we require certainty that exclusion of that testimony affected the outcome of the first trial.
Against this backdrop, we notice first that Payne and Flanagan admitted in their pleadings that profits were earned. In Paragraph IV of their Answer to Counter-Claim, the following appears:
The plaintiffs and counter-defendants [Payne and Flanagan] admit that the Grumman and Cessna aircraft profits were utilized for profit during the years 1976, 1977, 1978 and 1979; ... .
In view of this admission and the circuit judge's complete exclusion of all consideration of profits, we would be inclined to reverse if nothing more were before us.
Our review of the record, however, reflects that Cecil H. Payne gave two pages of testimony respecting profits before his lawyer had the presence of mind to object. To be sure, that objection was sustained. Still, we have before us for our consideration Payne's testimony that he flew the Cessna for approximately 100 hours, earning anywhere between $100 and $150 per hour. Murray's counsel did not make a formal proffer for the record following the sustaining of the objection. He didn't have to. Enough was already in the record so that we could see without doubt that some profits were earned.

V.
Our reversal here is a limited one. Payne and Flanagan have established a legally-binding and subsisting obligation on the part of Murray to pay them $4,620.00, or $2,310.00 each. This obligation was not seriously disputed at trial. The jury's verdict establishes it. Since there has been no assignment of error on this appeal challenging it, we hold that this much of the proceedings below require affirmance.
On remand, Murray is entitled to prove the net profits received by Payne and Flanagan attributable to their use and operation of the Cessna until it was sold to the new partnership. The amount of net profits so *56 determined shall be set off against the $4,620.00 obligation Murray owes to Payne and Flanagan.
We, therefore, reverse the judgment of the Circuit Court and remand this case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, BOWLING, HAWKINS, DAN M. LEE and PRATHER, JJ., concur.
NOTES
[1] After Murray's default and the Bank's repossession, it is not clear just where title to the Grumman reposed. Likewise, once the Grumman was traded for the Cessna, it is not shown who took title to the Cessna. However important title may be for other purposes, it is irrelevant here. This case is controlled by Article 9 of the Uniform Commercial Code as adopted in this state. Miss. Code Ann. § 75-9-202 (Supp. 1982) provides:

Each provision of this chapter [Article 9] with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor.
While this provision was originally inserted into the UCC to obliterate formalistic distinctions between the conditional sales contract and the chattel mortgage, it is equally applicable here. The Grumman was collateral [Miss. Code Ann. § 75-9-105(1)(c) (Supp. 1982)] and the Cessna was substitute collateral. For purposes of this case, title is irrelevant. See Anderson v. First Jacksonville Bank, 243 Ark. 977, 423 S.W.2d 273 (1968); and Ellzey v. Fyr-Pruf, Inc., 376 So.2d 1328, 1331 (Miss. 1979).
[2] We recognize that the liquidation of collateral by a secured party, such as the bank, or by subrogated secured parties, such as Payne and Flanagan, is governed by statute. Miss. Code Ann. § 75-9-504(3). The same must be "commercially reasonable". The debtor (here Murray) is entitled to notice prior to sale. No issues, however, have been raised regarding the sale of the Grumman, and we do not intend to invent any.
[3] In a very real sense, the Cessna constitutes "non-cash proceeds" of the bank's original collateral. As such it became subject to the bank's perfected security interest immediately upon its acquisition in trade for the Grumman, the original collateral. See Miss. Code Ann. § 75-9-306 (Supp. 1982). The record makes clear, however, that the parties did not regard the secured transaction as having ended with the acquisition of the Cessna on May 25, 1978. Rather, the Cessna was substituted collateral securing the renewed balance of the December 1, 1976, note. The parties did not in fact regard the secured transaction at an end until the sale of the Cessna to the new partnership on July 21, 1978, as described below.
[4] See footnote 2, supra. The Cessna was sold to a new partnership comprised of Payne, Flanagan and Joe Carraway. No question is raised regarding the validity or legality of this sale, nor with respect to the adequacy of the considerations paid.
[5] Although the pleadings allege use by Payne and Flanagan of both the Grumman and the Cessna, we find from the record that the only serious question surrounds the Cessna. The evidence received at trial contains no hint of any use or profits earned with respect to the Grumman.
[6] We are by no means unaware that there is a federal overlay to the law of secured transactions where an airplane is the collateral. Federal law, for example, dictates the procedures by which security interests in airplanes may be perfected. Under the Federal Aviation Act, all conveyances of aircraft must be recorded with the FAA at its central office in Oklahoma City. 49 U.S.C. § 1403. This recording system has been held to preempt all state laws governing the same matters. Philko Aviation, Inc. v. Shacket, ___ U.S. ___, 103 S.Ct. 2476, 76 L.Ed.2d 678 (1983). In Philko, the court also held that § 1403 preempted substantive state law regarding title transfers to the extent that the federal law provides that unrecorded transfers of title cannot be valid against innocent third party purchasers. The term "conveyance" is defined by the act as "a bill of sale, contract of conditional sale, mortgage, assignment of mortgage, or other instrument effecting title to, or interest in, property". 49 U.S.C. § 1301(20) (Supp. VI 1982). See also 14 C.F.R. § 49.31 (1983). In Philko, the court has held that failure to record any title transfers renders these transfers invalid as against innocent third parties. In the incomplete record that has come to this Court, there is no evidence that any of the conveyances of aircraft with which we are here concerned have been recorded as required by federal law. However, due to the narrowness of the issue that we have been asked to decide, these federal laws and regulations have no effect on the outcome of this case.
[7] Subsection (4) authorizes use or operation of the collateral for the purpose of preserving the collateral or its value. It is not completely clear that this is why Payne and Flanagan were using the Cessna or how their use helped preserve it or its value but no objection is raised to the fact of use or operation, so we inquire no further here.
[8] These general rules refer to the obligations of a secured party in possession before default. Section 75-9-501(1) provides that the same rules apply after default.
[9] We emphasize again that Payne and Flanagan treated the Cessna as collateral securing the note they made May 25, 1978, which in turn renewed the outstanding balance of the original December 1, 1976, note. The secured transaction was still on. Payne and Flanagan continued to treat the Cessna as collateral until July 21, 1978. If in fact Payne and Flanagan had after May 25 treated the original secured transaction of December 1, 1976, as having been concluded, there would have been two attendant consequences. First, Payne and Flanagan would have had no obligation to account to Murray for profits. Second, Payne and Flanagan would have forfeited any rights they may have had to bring suit against Murray for a deficiency judgment. See Miss. Code Ann. § 75-9-505(2) (Supp. 1982).
[10] Again, if we understand the record correctly, the time frame which Payne and Flanagan, as subrogated secured parties in possession, used the Cessna was May 25, 1978, to July 21, 1978. Profits earned after the sale of the Cessna to the new Payne, Flanagan and Carraway partnership are not considered.