# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-KA-01150-SCT

*WILLIAM VAUGHAN, JR. a/k/a WILLIAM EARL VAUGHAN, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/23/97 |
| TRIAL JUDGE: | HON. KOSTA N. VLAHOS |
| COURT FROM WHICH APPEALED: | STONE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OLEN LLOYD ANDERSON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: PAT S. FLYNN |
| DISTRICT ATTORNEY: | CONO CARANNA |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 05/13/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 6/3/99 |

**EN BANC.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. William Vaughan, Jr., was indicted for the sexual battery and lustful touching of Amber Tanner. The jury initially deadlocked, but it eventually convicted William on the sexual battery charge and acquitted him of the lustful touching charge. William appeals arguing, among other things, that the character evidence of Natalie Mann should have been admitted under Mississippi Rule of Evidence 608 to show that Amber Tanner maintained a capacity for untruthfulness. Such testimony may have discredited the victim's testimony and thereby led the jury to a different result in this case of conflicting testimony. Hence, we reverse and remand for a new trial on the sexual battery charge.

## STATEMENT OF THE CASE

¶2. On December 11, 1996, the Stone County Grand Jury indicted William ("Billy") E. Vaughan, Jr., on multiple counts: (1) sexual battery pursuant to then applicable Miss. Code Ann. § 97-3-95(c) (1994) for a November 1995 incident, and (2) touching of a child for lustful purposes pursuant to then applicable Miss. Code Ann. § 97-5-23 (1994 & Supp. 1998) for a May 17, 1996 incident. On June 17, 1997, Vaughan filed a Motion in Limine to exclude the intended testimony of prosecution witness Dr. Jane Cook. Trial was held June 23-25, 1997, before Circuit Court Judge Kosta N. Vlahos in the Stone County Circuit Court. At one point during its deliberations, the jury informed the judge that it was hung, with a numerical count of 9-

2[1] and 1 abstention. After a *Sharplin* instruction, the jury returned a verdict of guilty on the sexual battery charge while finding Vaughan not guilty on the touching of a child for lustful purposes charge. *See Sharplin v. State*, 330 So. 2d 591, 596 (Miss. 1976). That same day, the judge entered a final judgment and an order deferring sentencing in order to receive a pre-sentencing investigation. On July 2, 1997, Vaughan submitted a Motion for Judgment of Acquittal Notwithstanding the Verdict and/or a New Trial. Vaughan submitted another motion on August 19, 1997, in which, if his Motion for JNOV and/or New Trial was denied, he sought bond to be free from custody pending appeal. On September 22, 1997, the circuit court held a sentencing hearing and ordered Vaughan to serve ten (10) years, three (3) of which were suspended. Further, the circuit court judge granted bail, which was set at $25,000.00, pending appeal. On September 23, 1997, Vaughan filed his notice of appeal regarding the sexual battery conviction. Vaughan poses the following issues on appeal:

> **I. WHETHER THE STATE MET THE BURDEN OF PROOF NECESSARY TO CONSTITUTE GUILT BEYOND A REASONABLE DOUBT AS TO THE ELEMENTS REQUIRED FOR A CONVICTION PURSUANT TO MISS. CODE ANN. § 97-3-95(1)(c).**

> **II. WHETHER THE COURT ERRED IN ITS RULING THAT THE TESTIMONY OF DEFENDANT'S WITNESS REGARDING THE CHARACTER OF THE VICTIM WAS NOT ADMISSIBLE.**

> **III. WHETHER THE COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A MISTRIAL AFTER THE JURY ANNOUNCED IT WAS DEAD-LOCKED AND COULD NOT REACH A VERDICT.**

## STATEMENT OF THE FACTS

¶3. This is a case of he said-she said. The testimony is conflicting between the parties and, in some cases, individual testimony is not consistent throughout the entire examination. At issue in the trial were two evenings-one in November 1995 and the other May 17, 1996-in which Amber Tanner, the alleged victim, spent the night at the house of her friend, Courtney Vaughan. However, William was acquitted as to the alleged happenings of May 17, 1996, so that May incident is given a more cursory factual presentation that it would otherwise receive.

¶4. Amber Tanner, eleven years old during the two incidents, was a friend of Courtney Vaughan. Amber stayed over at Courtney's house several times prior to November 1995. The last time Amber stayed over at the Vaughans' house was May 17, 1996. In November 1995, Courtney invited Amber to spend Friday evening with her at her house. That evening, Amber and Courtney slept in the same twin bed. Amber was wearing a pajama suit consisting of blue shorts and a blue shirt. Amber testified that:

> We were laying in the bed and he [William] came in the and then I felt his finger go into me and then he touched my breast and my butt, and then he put the covers -- he put the covers on me and then went out, and I remember it was 4:52 when he left.

Amber testified that William went under her clothes and placed his finger in her "private part," i.e., her vagina. Amber testified she awakened and opened her eyes to see William after she felt him touch her.

¶5. William denied the incident:

Q. . . . She alleges that you went in there, in her bedroom, three or four o'clock in the morning, something like that, and put your finger in her vagina?

A. No, sir. No, sir. I wouldn't never do that to a child. As God as my witness I would never do that to a child. There ain't no way. I have got two girls of my own, a grandbaby, a grand-girl of my own, a grandson of my own, and there is no way that I would ever do anything to harm a child. No, sir. I did not.

Q. Why you reckon that she says that?

A. I don't know. Unless she's mad at me. I don't know. I don't know -- it totally surprised me. It took me by surprise.

William had no explanation for Amber's accusation. Further, William usually went to bed early and awakened early, even on weekends, due to his work week sleep pattern. He testified:

Q. At nights. What's your normal pattern in terms of getting up and out of the bed during the nights?

A. Once I go to bed I stay in bed until it's time to get up. During the week I have to get up at three o'clock. On weekends I try to stay in bed until at least six, seven o'clock to try to catch up on some of my rest. I wish I was like some people that could sleep to noon.

¶6. During the alleged incident, Courtney was asleep, though Courtney is a light sleeper and sleep-walker. Brenda Vaughan, Courtney's mother, said she checked on Courtney that night, as she always did. Nonetheless, both Amber and Courtney testified that Brenda did not enter the room during the evening, while Courtney testified that William also did not enter the room. Brenda is a light sleeper and testified that William is a loud snorer. Amber testified she lay in bed the next morning because she did not want to face William. According to Amber, at approximately 8:00 a.m., she informed Courtney that Courtney's father violated her, then Amber left with her mother at 9:30 a.m. Amber said that when she told Courtney what William did, Courtney "just kind of looked at the floor and didn't say anything." Amber did not inform an adult of the incident. Amber testified she was even scared to tell her mother.

¶7. Courtney, on the other hand testified that, Amber's mother picked her up in the afternoon. Brenda Vaughan testified that the children were joking and laughing as normal. Courtney said she was standing on a stool in the closet attempting to attain some Thanksgiving items and Amber tickled her such that she was about to fall. Courtney testified she pushed on Amber to keep from falling, and Amber slapped her. William witnessed the turn of events and told Amber to apologize, which she did. Courtney testified she knew Amber was angry because Amber exhibited her habitual behavior of ignoring a person when she gets angry at that person. Brenda testified that Amber pouted after being made to apologize. Amber testified she did not slap Courtney. Courtney further testified that Amber did not tell her of being touched by her father until after the slapping incident. Subsequent to Amber's departure, Brenda and William had a conversation, regarding which William testified:

Q. So what did you do after this conversation with Brenda that afternoon later after Amber had left?

A. I couldn't believe it. I couldn't believe it.

Q. Couldn't believe what?

A. I got mad. I got mad. I couldn't believe that she had said that about me knowing that there ain't no way, no way on God's green earth, no way. And told Brenda I said, "No. I don't want her to come back. No. Courteney can go over there if she wants to but she's not coming back here not while I'm here." I said, "If she's coming here I'm leaving." I said, "I'm going somewheres and I'll be gone and you let me know when they leave and I will be back."

William further testified:

Q. Now in November of 1995, you're telling this jury that Amber Tanner roundhoused your daughter and you were aware of Amber Tanner accusing you of putting your finger in her vagina and you didn't even call her parents?

A. That's right.

Q. You didn't think a conversation should have been had?

A. Yes. It should have.

Q. But that conversation never did take place?

A. No, it didn't.

It is evident the Vaughans knew and kept it quiet that Amber had accused him of touching her, but he, while uneasy about doing so, still let her return to the Vaughan home in May of 1996.

¶8. Amber retained her friendship with Courtney, but, due to fear of William, did not spend the night at the Vaughans' home again until May, 1996. Amber testified she chose to go back to the Vaughans' home because she did not want to say she was afraid of William; further, she did not think he would violate her again. Courtney testified she had Amber over again because she "felt sorry for her because she didn't have anything to do in the country." That Friday evening, Amber and the Vaughans went to Flint Creek where Courtney's paternal grandparents were camping. Courtney testified that while at the park, the girls swam, but, after eating, Amber wanted to swim again and William said no. Amber rejected William's answer by hanging on him and saying, "'Oh, I love you. Please let us go swimming, . . .'" Indeed, William testified:

Amber kept grabbing me around the neck, she kept grabbing me here and just, "Please, Mr. Billy, let us go swimming. Please let us go swimming. Oh, I love you so much. Please just let us go swimming. Let us go swimming." I said, "Please. No you can't." I said, "Amber, don't be doing that." I said, "There's people all over here." I said, "Everybody is around here." I said, "Y'all are not going swimming." About that time Courteney stepped in between us. And we walked on down a little bit further and started back, and when we started back the further we walked the further back Amber got. I kept telling her, "Amber, it's getting dark, honey. Come on up here." It was light, you know, and people was out and everything but I said, "Get up here so we can all be together."

Courtney, too, says she got between Amber and her father to stop Amber's behavior. Later, the group returned to the Vaughans' home, then talked, at which time Amber told the Vaughans of her aunt's murder and her fear to sleep by herself due to fear of being killed herself. Amber admitted to sleeping with her eighteen year old brother and to being hypnotized by her mother.

¶9. The children again slept together in Courtney's bed, and Amber wore the same bed clothes she was wearing during the November incident. Amber testified that William came into the room, and, while not touching under her clothes as he did in the November incident, touched her buttocks and breasts. William also denied this second accusation by Amber.

¶10. Amber testified once again that Brenda did not come in and fix her covers. According to Amber, Courtney also slept through this alleged incident. Yet, Courtney testified her father did not enter the room but that her mother put her and Amber's feet in the bed and covered them. Brenda testified she did pick up the feet of and cover the girls. Courtney and Brenda further testified that in the morning her father merely stuck his head in the room to awaken the girls for the day. At breakfast, the children were talking and behaving normally. Courtney was supposed to go with Amber to Gulfport on Saturday, but chose not to go. Amber was saddened by or, as William phrased it,"[k]ind of pouted" about Courtney's decision; Brenda described Amber as "very put-off, very upset." Courtney testified that Amber said nothing about her father entering the room during the night to touch Amber.

¶11. On Monday, May 20, 1996, Amber informed the elementary school counselor, Jean Breland, of the incident, but she did not inform Courtney. Amber testified that she did not inform Courtney because she felt Courtney would not do anything to rectify the problem given that Courtney did nothing regarding the first incident. Yet, Amber testified she told approximately three people that William touched and molested her.

¶12. Breland called Karen Tanner, Amber's mother. Amber testified she did not tell her mother because she was scared. Later, still on May 20, Deputy Sheriff Buddy Bell talked with Amber, Karen, and Karen's father. Four days later, Bell arrested William.

¶13. Karen took Amber to the Department of Human Services, but did not receive much help, so, approximately May 22, 1996, Amber and Karen went to see a gynecologist, Dr. Gilda Magee. Amber testified that she did not recall Dr. Magee asking her when the touching occurred. Yet, Dr. Magee testified that Amber related two fondling incidents-one that occurred May 17, 1996, and another that occurred two or three months prior, i.e., in February or March 1996, not November of 1995. Dr. Magee's examination consisted of listening to Amber's heart and lungs, feeling Amber's abdomen, and inspecting Amber's external genitalia. Dr. Magee testified that Amber weighed 146 pounds, which was obese for Amber's age.

¶14. Dr. Magee testified she discovered that "[s]he [Amber] did have a little, what we call [hymenal] notching, which is just evidence of a tearing at one -- at approximately seven o'clock position at the vaginal opening." Dr. Magee testified that hymenal notching is usually caused by trauma, which she testified usually implies vaginal sex, finger entrance into the vagina, or something tearing the vaginal opening. According to Dr. Magee, notching is "usually indicative of trauma that is usually considered to be sexually in origin unless proven otherwise." While Amber was menstruating, Dr. Magee did not ask her how many times she had her period. Despite the fact that large tampons can cause hymenal notching, Dr. Magee did not ask Amber if she used such products. Dr. Magee also failed to ask Amber if she had fallen on anything, had been treated previously by an applicator for a vaginal infection, if she engaged in self-sex, or if she had engaged in sexual intercourse with anyone. Dr. Magee testified that Amber told her she experienced neither bleeding nor significant pain, despite the fact that some bleeding or pain is usually experienced. Karen Tanner testified that Amber had never experienced a vaginal injury, a vaginal infection, or used tampons. Amber also saw a child psychologist, Dr. Jane Cook, on approximately five or six occasions.

¶15. Dr. T.K. Ellis, who practiced emergency medicine but at the time of trial was doing medical-legal

work, also testified. Dr. Ellis testified that the literature states that trauma may include horseback riding, bicycling, skiing accidents, gymnastics, and swinging in the yard. Dr. Ellis stated that, while potentially useless in a digital penetration case such as this, Dr. Magee should have used a rape kit for record and thorough examination purposes. Dr. Ellis also testified that Dr. Magee's examination of Amber did not meet the American Medical Association's standard procedure for examining people to determine if they have been sexually abused. Dr. Ellis testified that Dr. Magee's consideration of hymenal notching was the only objective finding that Dr. Magee made. Dr. Ellis further testified that it is well documented in the literature that "there are too many normal women," including children, who have minimal hymenal notching. Dr. Ellis testified that he has seldom seen bleeding from a sexual assault, but that there would be bleeding and pain if the hymen, i.e., skin, was torn. Dr. Ellis further testified:

> Q. So if a child was having her period or was already started menstruating would that be consistent with notching?
>
> A [Dr. Ellis]. Literature states yes, and they are doing more studies on these. They've already done a lot of them. And, you know, they are trying to get to the bottom of what all can cause it. They know it's some kind of traumatic event. And like I say, they have done studies, one in 1992 or 93 that took 79 girls that hadn't even started their period yet and found like a good percentage of them, like 11 percent or something like that, had minimal hymenal notching.

Dr. Ellis was of the opinion that hymenal notching meant nothing; he had even seen it in normal women who gave no history of sexual abuse.

¶16. At trial, Amber testified she had a good memory, but she seemed to confuse the two incidents during cross-examination. Further, Amber did not remember the November episode in which Courtney was attempting to attain the Thanksgiving decorations and Amber slapped her. Courtney and William testified that Amber said "[t]hat if she got into a fight it really didn't matter just so she got the last lick." Yet, Amber denies having such a belief. William testified that he has an honorably discharged Air Force veteran whom, post-military, worked in civilian positions that required secret security clearances. Evidence of William's good character and veracity was provided by Noel Mann, Wanda Parsons, and Marion Pettis. Further, Mann and Parsons were asked if their good opinion of William would change if they were told he sexually abused an eleven year old girl; they both responded with "no."

## DISCUSSION OF THE LAW

### I. WHETHER THE STATE MET THE BURDEN OF PROOF NECESSARY TO CONSTITUTE GUILT BEYOND A REASONABLE DOUBT AS TO THE ELEMENTS REQUIRED FOR A CONVICTION PURSUANT TO MISS. CODE ANN. § 97-3-95(1)(c).

¶17. Vaughan argues the evidence is not legally sufficient to support the verdict. A conviction for sexual battery pursuant to Miss. Code Ann. § 97-3-95 (1994) requires (a) sexual penetration, and (b) with a child under the age of fourteen. *See id.* Sexual penetration is defined in Miss. Code Ann. § 97-3-97(a) (1994) as "any penetration of the genital or anal openings of another person's body by any part of a person's body, . . ." *See id.* Indeed, "[p]enetration is the very essence of the crime of sexual battery." *Johnson v. State*, 626 So. 2d 631, 632 (Miss. 1993); *see also Thompson v. State*, 468 So. 2d 852, 853 (Miss. 1985); *and see West v. State*, 437 So. 2d 1212 (Miss. 1983).

¶18. This Court acknowledges "as corroborating evidence the victim's physical and mental condition after the incident, as well as the fact that she immediately reported the [sex **offense]. Also, the totally *uncorroborated* testimony of a [ ]victim is sufficient to support** a guilty verdict where that testimony is not discredited or contradicted by other evidence." ***Christian v. State***, 456 So. 2d 729, 734 (Miss. 1984) (emphasis in original & citations omitted); ***see also*** [***Collier v. State***, 711 So. 2d 458, 462 (Miss. 1998)](). It is the duty and province of the jury to pass upon the credibility of witnesses. ***Anderson v. State***, 461 So.2d 716, 719-20 (Miss. 1984). In the instant case, Amber reported the alleged November 1995 offense to her friend Courtney the next day, but she did not report it to authoritative parties until May of 1996- approximately six months later. Also, it is evident that Amber's testimony is contradicted by that of William, further one is left to wonder how the case would have turned out if the testimony of Natalie Mann, proffered as discrediting, had been admitted.

¶19. The proper standard for evaluating a challenge of insufficient evidence to support a conviction is settled. When, on appeal, one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. ***Carr v. State***, 655 So. 2d 824, 837 (Miss. 1995). We must, with respect to each element of the offense, consider all of the evidence--not just the evidence which supports the case for the prosecution--in the light most favorable to the verdict. ***Cooper v. State***, 639 So. 2d 1320, 1324 (Miss. 1994); ***Harveston v. State***, 493 So. 2d 365, 370 (Miss. 1986). Credible evidence consistent with the guilt must be accepted as true. ***Spikes v. State***, 302 So. 2d 250, 251 (Miss. 1974). Matters regarding the weight and credibility to be accorded the evidence are for the jury's resolution. ***Neal v. State***, 451 So. 2d 743, 758 (Miss. 1984).

¶20. A greater quantum of evidence favoring the State is required for the State to withstand a motion for a new trial, as distinguished from a motion for directed verdict. ***May***, 460 So. 2d 778, 781 (Miss. 1984). Under our established case law, the trial judge should set aside a jury's verdict and grant a new trial only when, in the exercise of his sound discretion, that judge is convinced the verdict is contrary to the substantial weight of the evidence. ***Id.*** In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must consider all the evidence, not just that supporting the case for the prosecution, in the light most consistent with the verdict, and give the State all favorable inferences which may be drawn from that evidence. ***Jones v. State***, 635 So. 2d 884, 887 (Miss. 1994); ***see also Strong v. State***, 600 So. 2d 199, 204 (Miss. 1992). Only where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal. [***Pleasant v. State***, 701 So. 2d 799, 802 (Miss. 1997)](); ***see also Eakes v. State***, 665 So. 2d 852, 871-72 (Miss. 1995). Any less stringent rule would denigrate the jury's constitutional power and responsibility in our criminal justice system. ***May***, 460 So. 2d at 781-82.

¶21. In other words, Vaughan's sufficiency of the evidence argument is a question of pure law and is directed to the trial court's denial of his motion for a directed verdict, while his argument that the verdict was against the overwhelming weight of the evidence is directed to the trial court's denial of his motion for a new trial and addresses the sound discretion of the trial court. [***Collier***, 711 So. 2d at 461.]()

¶22. In the instant case, the evidence is sufficient. The facts and inferences do not so point in favor of Vaughan that a reasonable person could not have found Vaughan guilty beyond a reasonable doubt. The testimony is conflicting, but it has not been absolutely discredited or contradicted. Further, the jury is tasked to pull truth from the conflicting morass. Amber testified to Vaughan's guilt and she had medical support that her hymen was torn, which may have been caused by the digital penetration of which Vaughan was

accused. Given such facts, the standard is simply too high for the defense to overcome.

## II. WHETHER THE COURT ERRED IN ITS RULING THAT THE TESTIMONY OF DEFENDANT'S WITNESS REGARDING THE CHARACTER OF THE VICTIM WAS NOT ADMISSIBLE.

¶23. Vaughan argues at length in both his Appellant's Brief and Reply Brief that the trial court erred by ruling inadmissible the testimony of a character witness who would have testified that the victim had the character and reputation of being untruthful.

¶24. This Court has stated that "[t]he relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused." *Hentz v. State*, 542 So. 2d 914, 917 (Miss. 1989). The judge's discretion must be exercised within the bounds of the Mississippi Rules of Evidence. *Johnston v. State*, 567 So. 2d 237, 238 (Miss. 1990). This Court must determine whether the trial judge employed the proper legal standard in its fact-findings governing evidence admissibility; if the trial court acted improperly, this Court applies a substantially broader standard of review. *Baine v. State*, 606 So. 2d 1076, 1078 (Miss. 1992). This Court deems reversal appropriate when the trial court has abused its discretion such that the accused is prejudiced. *Parker v. State*, 606 So. 2d 1132, 1137-38 (Miss. 1992).

¶25. Related to a discussion of admissibility of character attacks is Mississippi Rule of Evidence 607: "[t]he credibility of a witness may be attacked by any party, including the party calling him." *See id.* Also, pertinent to such a discussion is Miss. R. Evid. 608(a):

> **(a) Opinion and Reputation Evidence of Character.** The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

*See id.*

¶26. The use of character evidence to challenge the credibility of the victim is not a novel concept in Mississippi. In *Skaggs v. State*, 676 So. 2d 897 (Miss. 1996), this Court contemplated the trial court's exclusion of a defense witness who would have challenged the credibility of the accuser, an alleged rape victim. *Id.* at 902-03. Exclusion of the testimony was not harmless error; therefore, reversal was warranted. *Id.* at 903-04. In *Cooper v. State*, 628 So. 2d 1371 (Miss. 1993), this Court considered the language of Rule 608. *Id.* The Court quoted pertinent language from 3 Weinstein's Evidence § 608(01), pp. 608-10-11 (1993), which states:

> The theory underlying the use of evidence of character or conduct for impeachment purposes is that a person who possesses certain inadequate character traits-as evidence in a variety of ways including that he has acted in a particular way-is more prone than a person whose character, in these respects, is good, to testify untruthfully. It follows from this hypothesis that evidence of his bad character, or conduct is relevant to prove that he is lying. . . .
>
> . . . [C]redibility is often the crucial issue in a case, and character evidence, despite its flaws, "may still serve a purpose in calling to the jury's attention what might be an otherwise unknown deficiency of the

witness and thus give the jury a more adequate basis for judging his testimony.

Section 608(04), pp. 608-24-25 of Weinstein's treatise also states the effect of Rule 608 as follows:

Attack on Character: Proof by Opinion

Rule 608 departs from previous practice in authorizing proof by opinion whenever proof could be made by reputation, a change endorsed by many commentators who agreed with Wigmore that the exclusion of opinion evidence was "historically unsound" and "unfortunate."

. . . . **Witnesses may now be asked directly to state their opinion of the principal witness's character for truthfulness and they may answer for example, "I think X is a liar." The rule imposes no prerequisites conditioned upon long acquaintance or recent information about the witness; cross-examination can be expected to expose defects of lack of familiarity and to reveal reliance on isolated or irrelevant instances of misconduct or the existence of feelings of personal hostility towards the principal witness.** (Emphasis added.)

*Id.* at 1374. This Court reversed the case and stated that "[t]he trial court erred in ruling that an opinion as to truth and veracity is not admissible." *Id.* at 1374 & 1376.

¶27. The State, acknowledging *Cooper*, "recognizes that this testimony would be admissible under Mississippi Rules of Evidence [608(a)][(2)], which provides that the credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation." However, the State argues that there is no basis for determining error in the exclusion of the character witness's testimony because it contends no proffer was made.

¶28. "[I]t follows that counsel has the right, when an objection to the testimony of a witness is sustained, to show in the record by appropriate means the nature and content of the proposed testimony." *Hitt v. State*, 217 Miss. 61, 67, 63 So.2d 665, 667 (1953). The standard for effecting a proffer is a rather low threshold, as evidenced in *Pennington v. State*, 437 So. 2d 37, 39 (Miss. 1983):

Although the lower court here did not permit appellant's counsel to make a record and no real proffer was made by dictating into the record what the appellant desired to show by the testimony and by the evidence, appellant's counsel did state that the purpose of the evidence was to show what a simple process it is to remove a latent fingerprint from a cigar box. That officially indicates to this Court what was the purpose of the evidence.

*See id.*

¶29. At issue is the discussion revolving around a motion in limine moved by the State to preclude the character testimony of Natalie Mann as to the character of Amber Tanner:[(3)]

BY MR. LEVI [Counsel for Vaughan]: We'll call a character witness Natalie Mann.

BY THE COURT: Jury go to the jury room.

(THE JURY WAS EXCUSED FROM THE COURTROOM AT 4:18 P.M. WHERE THE FOLLOWING TRANSPIRED IN THEIR ABSENCE:)

BY THE COURT: Do you want to make a Motion In Limine or what?

BY MR. BOURGEOIS [Assistant District Attorney]: Yes, sir. I move in limine.

BY THE COURT: Go ahead and put it in the record. We talked about it at the bench but the record needs to know what it is.

. . . .

BY THE COURT: . . . Then you also indicated, Mr. Levi, that you wanted to call, I forget the young lady's first name, Mann.

BY MR. LEVI: Yes. Natalie Mann.

BY THE COURT: And you said that you were going to offer her as a character witness concerning the --

BY MR. LEVI: The victim.

BY THE COURT: The truthfulness of the victim.

BY MR. LEVI: Yes, sir.

BY THE COURT: And the State is going to object, and I asked you to give me a rule and you gave me Rule 4.04 and 4.05, is that correct?

BY MR. LEVI: Yes, sir. In conjunction with Rule 6.08 and 6.08, Your Honor.

BY MR. BOURGEOIS: Yes, sir. The State's position is that -- that the character of Amber Tanner is not at issue, Judge, and we'd object to that testimony coming forth from the witness stand.

BY THE COURT: Anything further on that?

BY MR. LEVI: Your Honor, I think the rule is clear it says that --

BY THE COURT: Which rule are your talking about?

BY MR. LEVI: Well 4.04, Your Honor. It says, "Evidence of a person's character or a trait of his character is not admissible for purposes providing that he acted in conformity therewith on a particular occasion except," and then we go to (2), it says, "character of victim. Evidence of a pertinent trait and character of the victim of a crime offered by the accused, by the prosecution, to rebut the same evident or evidence of a character's peacefulness of the victim offered by the prosecution to rebut evidence that the victim was the first aggressor." You have to read that, Your Honor, in conjunction with Rule 6.08 which says, "The credibility of a witness may be or supported by evidence in the form of opinion or [reputation] but subject to these limitations. The evidence may refer to character truthfulness or untruthfulness. And evidence of truthful character is admissible only by the character witness for truthfulness has been attacked by opinion or [reputation]."

**We have a person who will testify basically to these facts, Your Honor. That she knows the child, she's her contemporary, known her for several years, ask her what her [reputation] is**

**in the community for truthfulness and honesty and she will answer them. That it is a bad [reputation] for truthfulness or words similar to that.**

BY THE COURT: What's the last rule that you read?

BY MR. LEVI: Sir?

BY THE COURT: What was the last rule that you read from?

MR. LEVI: 6.08.

BY THE COURT: Unless the [reputation] for truthfulness is at issue brought by the person who has offered that witness as testimony --

BY MR. LEVI: He offered -

BY THE COURT: Don't interrupt me. That's one little pet thing that I have. It's the position of the Court that that has not been done, and the issue, opinion of truthfulness, is not at issue in this case as to the prosecutrix Ms. Tanner.

BY MR. LEVI: In light of Your Honor's ruling we would move to strike her entire testimony because I assume when she was sworn and put under oath that her truth and veracity was being vouched for by her prosecution. So, therefore, in accordance also with Rule 6.07 that says who may be impeached, it says, "The credibility of the witness may be attacked by any party including the party calling her." And we present -- we state, Your Honor, that we're entitled to attack her credibility by offering opinion testimony as to her honesty and truthfulness.

BY THE COURT: That will be noted and the objection of the State will be sustained at this time. There cannot be any attack by opinion testimony as to truthfulness of the prosecutrix given the state of the case as it's presented before the court. In view of the Court's ruling then who would be your next witness?

(emphasis added). Of further relevance is the discussion which occurred during the hearing on the motion for new trial:

BY MR. ANDERSON [Counsel for Vaughan]: . . .

. . . .

We also ask that a new trial be granted on the basis that we were not allowed to present a character witness to impeach the alleged prosecuted witness in this case. I believe the Uniform Circuit Court -- I'm sorry the rules are clear, the Mississippi Rules of Civil Procedure and Evidence that we should have been allowed to put on character evidence since it was obvious to me that the character of the alleged prosecuting witness that was involved in this matter put that at issue when she said that Mr. Vaughan touched her, and we should have been allowed to present testimony according to the rules of evidence that her character was not good to say the least, and she had a propensity to lie. On these two basis we request that this court grant Mr. Vaughan a new trial on count one of the indictment, sexual battery.

BY THE COURT: What proof is evident that there was a compromised verdict?

BY MR. ANDERSON: Well, Your Honor, they came back and said they could not arrive at any verdict. Of course, this Court I believe at the time did not want to over-question the jury. And for them to go back in -- for them to deliberate all day and then to go back in for 40 minutes and come out with one verdict of guilty and one verdict of not guilty, you know, presents evidence to me that there was a compromise so that, you know, they could arrive at a verdict. We further believe that the instructions which this Court gave the jury put pressure on them to arrive at a verdict.

BY THE COURT: All right. Mr. Bourgeois.

BY MR. BOURGEOIS: Judge, the State would stand on the record. If I'm not mistaken defense counsel attempted to put character evidence on before character -- with regard to defendant's statement before the defendant even took the stand. The State objected to that. He put two character witnesses on the stand. Just because he didn't put his third one on the State stands on the record, Judge. That's all.

BY THE COURT: Any response?

BY MR. ANDERSON: We put character witnesses on in behalf of Mr. Vaughan?

BY THE COURT: Which --

MR. ANDERSON: Which we would have been allowed to do. And the one that we attempted to put on would have been to impeach the credibility of the prosecuting witness. That's one which we were not allowed to do so, and we believe we have a right pursuant to Rule 7 to do that?

BY MR. BOURGEOIS: Judge, the only right that you have goes to truthfulness. And if I'm not mistaken they were attempting to go beyond truthfulness. 4.12 specifically precludes that.

BY MR. ANDERSON: What we were going for was her propensity to lie in the community or falsehoods. I believe that goes towards truthfulness.

**BY THE COURT: Did I allow you to go ahead and make a record, a proffer?**

**BY MR. ANDERSON: Yes, sir. My memory --**

**BY THE COURT: So the Supreme Court has that?**

**BY MR. ANDERSON: Yes, sir.**

BY THE COURT: All right. I'll deny the motion for a new trial. I'll let the jury verdict stand.

(emphasis added).

¶30. In the instant case, the threshold for this issue is whether a sufficient proffer was effected. Under Rule 103(a)(2) a substantial right of Vaughan has been affected because he reasonably relied on the plain language of the evidentiary rules to bring a case that the rules reasonably allowed. By excluding Natalie Mann's testimony, Vaughan was rendered helpless to discredit the testimony of the key prosecution witness, Amber Tanner, a child whose character is questionable. The second part of the Rule 103(a)(2) test

requires the substance of the evidence be made known to the court. As emphasized above, Vaughan's counsel placed in the record that Mann would testify that Amber's reputation for truthfulness was "bad." Such information is enough to provide the substance of the testimony. It was quite clear that Mann would be called to explain that Amber's character and reputation was that of being untruthful.

¶31. Given that the character testimony was sufficiently proffered, the next consideration is whether or not the testimony was admissible. As touched upon in the above consideration of whether a proper proffer was made, the accused was prejudiced by not being allowed to fully bring his case in light of the plain language of the evidence rules. Such is abuse of discretion. Rule 404 specifies that a character evidence of a pertinent trait of the victim may be offered by the accused to show that the victim acted in conformity therewith. *Id.* In this case, Vaughan simply followed the rule. He offered testimony that would show that Amber Tanner conformed with her trait for untruthfulness. Vaughan also followed the Rule 405 requirement that reputation testimony be used to make proof. *Id.* Further, Vaughan complied with Rule 608(a), which states that the evidence must refer to truthfulness or untruthfulness and may be admitted only if the witness's character for truthfulness previously has been attacked by opinion or reputation evidence. *Id.* In this case, the evidence referred to truthfulness. Further, Amber's character for truthfulness had already been attacked at the time Mann's testimony was proffered, because Amber denied having the belief of needing to get in the last lick while Courtney Vaughan testified that Amber stated to her that getting the last lick was what mattered when one gets into a fight. Hence, the testimony was admissible.

¶32. While the testimony has been deemed admissible, the final step is to consider whether Natalie Mann's testimony should have been admitted to discredit the character of the accuser, Amber Tanner. As explained above, Vaughan was prejudiced in that he was not allowed to show that his accuser's character was that of untruthfulness while the case turned upon his accuser's claim that he sexually battered her. While the accuser did have some medical evidence supporting her case, the gynecologist could have been more careful and precise in her analysis. Further, the gynecological evidence would have been rendered rather meaningless if Amber was discredited. If such had occurred, the jury would then have more reason to wonder precisely how Amber's hymen was notched. The jury might even begin to think that Amber did it herself to counter anger about not getting her way during the slapping episode at the Vaughans' home. Accordingly, the trial court abused its discretion.

### III. WHETHER THE COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A MISTRIAL AFTER THE JURY ANNOUNCED IT WAS DEAD-LOCKED AND COULD NOT REACH A VERDICT.

¶33. Since this case is being reversed due to such abuse of discretion, we do not reach this third issue raised by Vaughan.

### CONCLUSION

¶34. This is a case of conflicting testimony between the defendant, William Vaughan, and the alleged victim, Amber Tanner. The case is reversed and remanded under Miss. R. Evid. 608 due to the trial court's abuse of discretion in excluding Natalie Mann's testimony that would have attacked Amber Tanner's credibility and, inherently, the veracity of her testimony. Given that the prosecution's case is grounded in Amber's testimony and that it has been reported that Amber deems it important to get in the last lick, the case may have turned out differently if Mann's testimony had been allowed. Accordingly, the judgment is reversed, and this case is remanded for a new trial on the sexual battery charge consistent with this opinion.

¶35. **REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, WALLER AND COBB, JJ., CONCUR. SMITH, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, MILLS AND WALLER, JJ.**

### SMITH, JUSTICE, SPECIALLY CONCURRING:

¶36. I agree with the Majority that the trial court abused its discretion in ruling defense witness Natalie Mann's testimony inadmissible. I write to emphasize Mississippi Rule of Evidence (M.R.E.) 103(a)(2) and its supporting case authority which justify the Majority's holding. The threshold issue here "is whether a sufficient proffer was effected." Maj. Op. at 21. In its brief, the State concedes that, but for the lack of a sufficient proffer, "this testimony (Mann's testimony) would be admissible under Mississippi Rules of Evidence [608](a)." The State argues instead that the defense did not make a proffer for the record.

¶37. The State relies upon *Wilcher v. State*, 697 So.2d 1087, 1093 (Miss. 1997), where this Court held that the defendant was procedurally barred from raising claim that the lower court erred by refusing to rule in limine on admissibility of certain evidence of "prior bad acts," because the defendant failed to proffer his testimony. *Id.* Thus, the State asserts that the defense was required to "put the child on the stand for a proffer" in order for this Court to be able to assess her testimony.

¶38. The State's argument revolves around M.R.E. 103(a)(2), which states as follows:

> (2) Offer of Proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

The Official Comment to the Rule states that "...when a party objects to the exclusion of evidence, he must make an offer of proof to the court, noting on the record for the benefit of the appellate court what evidence the trial judge excluded." *See King v. State*, 374 So.2d 808 (Miss.1979); *Brown v. State*, 338 So.2d 1008 (Miss.1976).

¶39. Vaughn responds that it was not necessary to call Natalie Mann to the stand and question her outside the jury's presence, because an aggrieved party may preserve the record by dictating into the record a statement of the evidence offered but excluded. Vaughn is correct. In *Heidel v. State*, 587 So.2d 835 (Miss. 1991), we held that before a party may secure appellate reversal on an evidentiary exclusion that party must have placed in the record the **substance** of the evidence he would have offered had the court ruled otherwise. *Id*. at 844 (*citing* M.R.E. 103(a)(2)) (emphasis added); *see also Murray v. Payne*, 437 So.2d 47, 55 (Miss. 1983). Here, a review of the record and transcript reveals that a proper proffer was made by defense counsel during argument over the objection, because the substance of Mann's proposed testimony was discussed at length. The Majority outlines this argument in detail. Maj. Op. at 18-21. Therefore, the substance of Mann's proposed testimony is in the record, and we can assess that testimony.

¶40. Accordingly, I specially concur.

**BANKS, MILLS AND WALLER, JJ., JOIN THIS OPINION.**

1. The court instructed the jury spokesperson to disclose only the numerical split in the jury, not the number of votes for conviction and the number of votes for acquittal.

2. The State cites Rule 806(a), but there is no Rule 806(a). Further, the *Cooper* case to which the State refers, cites Rule 608(a). The State made a typographical error by citing Rule 806(a) while it meant to cite Rule 608(a).

3. Vaughan reasonably points out in his Reply Brief that "[i]n the transcript the word 'reputation was mistakenly transcribed as 'representation' as can be verified by the quotations elicited for [the] Mississippi Rules of Evidence."